The MANSFIELD AREA CITIZENS GROUP, Plaintiff,

v.

UNITED STATES of America et al., Defendants.

Civ. No. 76–177.

United States District Court, M. D. Pennsylvania.

May 12, 1976.

C. Wayne Smyth, Troy, Pa., for plaintiff.

John M. Hrubovcak, James J. Kutz, Asst. Attys. Gen., Commonwealth of Pa., Harrisburg, Pa., for defendant Commonwealth of Pennsylvania, Dept. of Transportation.

Laurence Kelly, Asst. U. S. Atty., Scranton, Pa., for the United States, Hoffman, Gribble and McGarry.

## OPINION

MUIR, District Judge.

This suit for injunctive relief was tried to the Court with an advisory jury from April 12, 1976 through April 21, 1976. The Court makes the following findings of fact.

## I. FINDINGS OF FACT

### PROJECT DESCRIPTION

1. Plaintiff is an unincorporated association. (Uncontested)

2. The Tioga-Hammond Lakes Project (project) was authorized by the 85th Congress in the Flood Control Act of July 3, 1958, Public Law 85–500, in accordance with the recommendations of the Chief of Engineers in House Document 394, 84th Congress, Second Session. (Uncontested)

3. A substantial number of the members of the Plaintiff group is affected by the Tioga-Hammond Dam Project, each of them having a personal stake in the outcome of this litigation.

4. The Defendant U. S. Corps of Army Engineers has been authorized to carry out the Tioga-Hammond Dam Project. (Uncontested)

5. The Tioga-Hammond Dam Project is one part of a projected system of reservoirs to reduce flood damage within the North Branch of the Susquehanna River Basin. (Uncontested)

6. The project is located in Tioga County, Pennsylvania, upstream from the confluence of Tioga River and Crooked Creek. (Uncontested)

7. The project consists of two dams and lakes having common outlet works and spillway, with the spillway in the Hammond Dam and a multiple level outlet works in the Tioga Dam. (Uncontested)

8. The Tioga Dam is being constructed on the Tioga River approximately 1.7 miles above the mouth of Mill Creek, three quarters of a mile upstream from the Borough of Tioga. (Uncontested)

9. Hammond Dam is approximately opposite Tioga Dam, on Crooked Creek about 3.3 miles upstream from the mouth of the creek. (Uncontested)

10. A channel approximately 2,700 feet in length with a bottom width of 100 feet and a bottom elevation at 1,060 feet will connect the two lakes through a saddle in a rocky portion of the ridge which separates the Tioga River and Crooked Creek basins.

11. A gated weir with a crest elevation of 1,101 feet will be provided to release alkaline water into Tioga Lake.

12. The Tioga Dam will be a rolled-earth and rockfill embankment about 2,710 feet long and 140 feet high. (Uncontested)

13. The outlet works of the Tioga Dam will be located in the left abutment and will consist of a combined tower and gate structure with two hydraulically-operated service gates, a 14.5 x 21.0 foot conduit, and a spilling basin.

14. The Hammond Dam is also of rolled earth and rockfill construction and will be about 6,450 feet long and 122 feet high. (Uncontested)

15. The uncontrolled spillway with crest at elevation 1,131 feet will be located adjacent to the left abutment of the Hammond Dam.

16. A continuous flow structure will be provided through the Hammond Dam embankment to tap the Hammond pool and maintain flow in Crooked Creek. (Uncontested)

17. This continuous flow structure will consist of an intake structure with a 30-inch slide gate, a 36-inch diameter conduit and outlet works.

18. The Tioga Lake at the recreation pool elevation of 1,081.0 feet will extend 4.2

miles up the Tioga River Valley, have a shoreline of 14.0 miles and an area of approximately 500 acres.

19. The Hammond Lake at the recreation pool elevation of 1,086.0 feet will extend 3.2 miles up the Crooked Creek Valley, have a shoreline of 8.4 miles, and an area of approximately 665 acres. (Uncontested)

20. When the dams are in operation, they will provide summer recreation pools from May 15 to Labor Day.

21. Removal of existing railroads, highways, and utilities within the project area has required the relocation and construction of approximately 10 miles of railroads, 19 miles of highways, 10 miles of power lines, 12 miles of pipelines, and 18 miles of telephone lines.

22. The project has required the relocation of 10 cemeteries containing 870 graves.

23. The Pennsylvania Department of Transportation is carrying out the relocation of U. S. Highway Route 15 required by the Tioga-Hammond Dam Project. (Uncontested)

24. Local protection for the community of Mansfield will consist of a rolled earth levee along the east bank of the Tioga River.

25. Protection against flood flows on Corey Creek near the Borough of Mansfield will be enhanced by the construction of a conduit.

26. The purposes of the project are flood control and recreation.

27. From the inception of the project to the present, numerous opportunities have been afforded the residents in the project area (Tioga County) both through public meetings and meetings with their elected and appointed representatives to express their views on the project.

28. The Corps has been accessible at its offices in Tioga and Wellsboro and members of the public have been welcome to visit and to inquire into all phases of the project plans. (Uncontested)

29. Wherever possible, correspondence from area residents and their representatives has been answered and questions dealt with. (Uncontested)

30. Applicable regulations require the preparation of a set of design memoranda on the Tioga-Hammond Dam Project. (Uncontested)

31. Pursuant to said regulations, 24 design memoranda, including a preliminary master plan and a master plan, have been submitted from November, 1965 to the present date. (Uncontested)

32. The majority of contracts on this project have already been awarded. (Uncontested)

33. The dam foundation has been excavated. (Uncontested)

34. An investigation of the soils under Tioga Hammond Dam has been done by the Corps.

35. Borrow areas have been opened. (Uncontested)

36. Highway rights-of-way have been substantially cleared and preliminary grading accomplished. (Uncontested)

37. As of December 31, 1975, project expenditures totalling $77,074,700.00 have been made towards the total project cost of $157,700,000.00. (Uncontested)

38. $24,820,000.00 worth of contracts are still unlet.

39. These expenditures represent $9,683,600.00 for Real Estate Acquisition and Administration. (Uncontested)

40. Approximately $8,889,800.00 has been spent for engineering and design. (Uncontested)

41. About $2,272,400.00 has been spent for supervision and Administration. (Uncontested)

42. Approximately $16,500.00 has been spent for Permanent Operating Equipment. (Uncontested)

43. Approximately $1,813,400.00 has been spent for completed construction contracts. (Uncontested)

44. Approximately $54,399,000.00 has been spent for ongoing construction contracts. (Uncontested)

45. Aerial photographs have been periodically taken at the dam site which depict the progression of the work on the project. (Uncontested)

## NATIONAL ENVIRONMENTAL POLICY ACT

46. The Environmental Impact Statement for the Tioga-Hammond project (hereinafter EIS) was begun on June 15, 1970. (Uncontested)

47. Larry J. Lower, Chief, Environmental Analysis Branch, was intimately involved in its preparation. (Uncontested)

48. His qualifications at time of writing of the EIS were:

a. B.S. in Agriculture, University of Missouri, 1965.

b. Masters Degree, Landscape Architecture, University of Michigan.

c. Landscape Architect working in recreation planning.

d. Landscape Architect, Environmental Analysis Branch. (Uncontested)

49. Lower had four men working with him at that time.

50. This staff included an oceanographer, two biologists, and a civil engineer. (Uncontested)

51. This staff worked as a team to investigate, research and analyze the Tioga-Hammond project for the purpose of complying with the procedural mandate of the National Environmental Policy Act (NEPA). 42 U.S.C. §§ 4331 et seq.

52. The EIS was prepared under Council on Environmental Quality (hereinafter CEQ) guidelines dated January 28, 1971.

53. The EIS was prepared under Corps of Engineer Circulars and Engineer Regulations (hereinafter EC and ER) as follows:

a. EC 1165–2–83, 3 Mar. 1970

b. EC 1165–2–86, 30 Apr. 1970

c. EC 1120–2–56, 25 Sept. 1970 and Appendices A & B.

d. EC 1165–2–91, 30 Sept. 1970

e. ER 1165–2–500, 30 Nov. 1970. (Uncontested)

54. The U. S. Corps of Army Engineers prepared an Environmental Impact Statement required by the National Environmental Policy Act, dated April 19, 1971. (Uncontested)

55. The Copy of said Statement attached to Plaintiff's Complaint differs from the Statement filed by not having attached to it the correspondence with governmental units (summarized in the Statement) listed under "Coordination with other agencies". (Uncontested)

56. The discrepancy noted in the previous finding came about by the omission by an agent of the U. S. Corps of Army Engineers of said correspondence from the Impact Statement furnished in response to a request from Eugene Korb, representative of and member of Plaintiff unincorporated association. (Uncontested)

57. The final EIS was filed with the CEQ on June 2, 1971. (Uncontested)

58. Prior to this filing, the EIS was circulated with federal, state and local agencies. (Uncontested)

59. Their comments and appropriate responses were included in the final EIS as filed with the CEQ. (Uncontested)

60. The final EIS has been circulated to various members of the affected public. (Uncontested)

61. The EIS as filed with the CEQ consisted of 46 pages. (Uncontested)

62. The Corps has not received any negative response from the CEQ on the EIS. (Uncontested)

63. Throughout the construction of the project it has been the Corps' policy to maintain ongoing dialogue with state and local agencies and members of the general public.

64. There have been no major changes in the project since the filing of the final EIS with the CEQ.

65. The Environmental Impact Statement dated April 19, 1971, has not been amended or updated. (Uncontested)

66. The Pennsylvania Department of Transportation has filed no separate Envi-

ronmental Impact Statement concerning relocation of U. S. Highway Route 15. (Uncontested)

67. Said Department has made no provision for utilities to serve residents of the area displaced from their homes but wishing to relocate on their own lands above and contiguous to the taking.

68. No separate environmental Impact Statement has been filed for the entire projected system of reservoirs to reduce flood damage within the North Branch of the Susquehanna River Basin. (Uncontested)

69. By authority of § 80(b) of the Water Resources Development Act of 1974 (P.L. 93–251) as clarified by ¶ 7 of EC 1105–2–204 dated September 6, 1974, the applicable interest rate of 3⅛% for the Tioga-Hammond Lakes Project was frozen when budget justification reflecting 3⅛% was formally presented to Congress for continuation of land acquisition in February, 1968. (Uncontested)

70. Engineering considerations are covered in the Design Memoranda. (Uncontested)

71. Studies by the Corps indicated the foundation soils to be more than sufficient to support the dam structure.

72. Many large dams have been constructed by both Federal and state agencies in glaciated areas. (Uncontested)

73. The Corps has given great consideration, both before and during project construction, to problems concerning soil erosion and sedimentation control.

74. Corps' contracts contained provisions whereby its contractors are required to implement erosion and sedimentation control plans and to secure all necessary federal, state, and local agency approvals and permits. (Uncontested)

75. The final EIS has dealt with the problem of acid mine drainage and the resultant effect on the recreational lake to be created.

76. The Corps of Engineers has made and is making numerous studies on acid mine drainage and the acid content of the reservoir. (Uncontested)

77. Design Memorandum No. 21, Environmental Analysis, dated March, 1973, outlines the acid mine drainage study undertaken by the Corps. (Uncontested)

78. The pH of water in the Tioga River from the Blossburg-Morris Run area to the projected high point of summer pool of the Tioga Lake on the present river varies from 3.1 to 5.4. (Uncontested)

79. The pH factor is the logarithm of the reciprocal of the hydrogen ion concentration in the water.

80. The pH factor in Hammond lake will average 7.5.

81. Water having a pH factor 6.5–8.5 is considered very good.

82. The pH factor of Tioga Lake will vary from 4.0 to 6.9.

83. There is no threat to human life or wildlife from water having a pH factor of 4.0.

84. Water with a pH factor of 4.0 is suitable for water contact sports.

85. The water in Tioga Lake will be potable.

86. The water in Tioga Lake will be better than water presently in the Tioga River because of the dilution of water coming from the coal mines in the vicinity.

87. Water will flow from Hammond Lake into Tioga Lake because Hammond Lake is five feet higher than Tioga Lake.

88. The water from Hammond Lake will improve the water in Tioga Lake.

89. The water in Tioga Lake will be suitable for some recreational purposes such as boating and sailing.

90. The Pennsylvania Department of Health has not established criteria for body contact recreation in acid water. (Uncontested)

91. The Corps operates other reservoirs filled with acidic water that are suitable for the above recreational purposes.

92. The quality of the water flowing from Tioga Dam downstream will be good.

93. The water in Tioga Dam will not harm wildlife.

94. The Corps has studied methods to reduce the acid in the water of the Tioga River the implementation of which could reduce the acidity of the water in the Tioga reservoir.

95. These studies considered many alternative plans for acid abatement. (Uncontested)

96. For plans emerged for in-depth consideration. (Uncontested)

97. An acid abatement program has been developed that could be initiated, if authorized by Congress, that would eliminate or control acid pollution in Tioga Reservoir.

98. Environmental impacts are covered in sources other than the EIS, including Design Memorandum No. 21, Environmental Analysis, dated March 1973. (Uncontested)

99. The Corps maintains control of 300 foot wide segments around the perimeters of the entire Tioga and Hammond reservoirs.

100. The real estate acquisition phase of this project started in fiscal year 1969. (Uncontested)

101. Construction began on September 14, 1971. (Uncontested)

102. Approximately 18% of this project was completed as of the effective date of the Water Resources Development Act, 33 U.S.C., § 701b–11. (Uncontested)

103. As of April 10, 1974, $71,990,000.00 of the construction contracts had either been completed or awarded. (Uncontested)

104. A dry dam has no recreational potential.

105. Even if a dry dam were used at the site of the project, the Mansfield Protective Works would still be required, essentially as planned.

106. The moving of the proposed levees at the school property in Mansfield over 100 feet west is not feasible.

107. The Corps has considered all reasonable alternatives to the proposed plan for the Mansfield Protective Works.

108. The plan, as adopted, will not only protect Mansfield from the adverse effect of reservoir operation, but it will also provide a very high degree of protection from the natural flood hazard that has always existed.

109. The original project concepts of December 30, 1950, did not contemplate recreational facilities at the Tioga-Hammond sites. (Uncontested)

110. It was originally conceived as a dry dam. (Uncontested)

111. Costs and benefits for recreational development were not used. (Uncontested)

112. Drawdowns will occur outside the main times for recreation.

113. These drawdowns will not affect the use of the potential of the reservoirs for recreation.

114. The reservoirs will be brought up to recreation level in May of each year prior to prime recreational usage.

115. No studies have called into question the outstanding quality of water that will enter and form Hammond Lake. (Uncontested)

116. The Tioga area has very little recreational potential of the type and quality that will be provided by the twin reservoirs and accompanying facilities.

117. The Tioga Dam Project Environmental Impact Statement is incorrect in describing the timber cover of the Project area. (Uncontested)

118. Smythe Park is a playground and park important to the Mansfield community. (Uncontested)

119. Pertinent Design Memoranda document the recreational potential of the area before the project was instituted.

120. Hills Creek has a surface area of only 137 acres. (Uncontested)

121. The Pennsylvania Department of Highways owned and maintained the legal

right of way of Traffic Route 15, a north-south two-lane highway. (Uncontested)

122. As a consequence of the project enumerated in ¶ 2, approximately 6.0 miles of Traffic Route 15 had to be consumed by the United States Army Corps of Engineers and plans for relocation of same therefore made. (Uncontested)

123. On May 17, 1968, Mr. Kenneth C. Larson, District Engineer of the Pennsylvania Department of Transportation requested information from the Corps pertinent to the relocation of Traffic Route 15 between Mansfield and Tioga Boroughs, Pennsylvania. (Uncontested)

124. The Corps originally contemplated a three-segment relocation of Route 15.

125. The new U.S. Route 15 will be a four-lane, limited access highway. (Uncontested)

126. On December 9, 1969, Kenneth C. Larson forwarded to the Corps plans for a two-lane on a four-lane highway. (Uncontested)

127. Such was requested because the Highway Department had a long-term plan to reconstruct Route 15 as a four-lane, limited access highway from the New York border south to Williamsport called the Appalachia Highway System. (Uncontested)

128. That section of Route 15 which had to be acquired by the Corps was not scheduled for reconstruction for several years to come. (Uncontested)

129. The Corps has been working closely with the Pennsylvania Department of Transportation in the present relocation of Highway 15.

130. The decision to make U.S. Highway Route 15 a four lane limited access highway was the decision of the Pennsylvania Department of Transportation and not a requirement of the U.S. Corps of Engineers, for the Tioga-Hammond Dam Project. (Uncontested)

131. It was agreed that a section of existing Route 15 and its appurtenances would have to be acquired and relocated by the Corps in order to allow construction, completion and enjoyment of the Tioga Project. That is, the construction of the "Dam" would flood a portion of existing Route 15. (Uncontested)

132. To accommodate the proposed relocation of Route 15, the Corps agreed to acquire title to so much of its land and the lands of others within and adjacent to the project area which was necessary to provide for the proposed relocation of Route 15. (Uncontested)

133. Such acquisition included all land necessary to give the Commonwealth sufficient right-of-way for a four-lane limited access highway. (Uncontested)

134. The Commonwealth agreed upon completion of the relocation work to accept said substitute facilities and/or payments as full and just compensation. (Uncontested)

135. At such time as the Government made available the necessary right-of-way for the relocation, the Commonwealth was to furnish the services, labor, etc. necessary to perform the relocation. (Uncontested)

136. The intent of the contract was as follows: instead of the Government merely relocating the existing affected sections of Route 15, it was to acquire all property required to upgrade and relocate the highway in accord with the Commonwealth's intent and contribute that amount to the Commonwealth which the Government would have expended in relocating the existing Route 15. (Uncontested)

137. Upon completion of the work performed by the Commonwealth, which was to be done by October, 1976, the Government was to pay the Commonwealth the full amount it owed. (Uncontested)

138. Partial payments, at the request of the Commonwealth were made as the work progressed, based on monthly estimates approved by the Government.

139. The length of relocated Route 15 is 8.2 miles. (Uncontested)

140. The total construction cost of the relocation is $19,483,844.55. (Uncontested)

818

141. The Corps has paid the Pennsylvania Department of Transportation a total of $9,445,801.00. (Uncontested)

142. There remains to be paid to the Pennsylvania Department of Transportation an outstanding total of $881,882.00. (Uncontested)

143. The development of the relocation of Route 15 began in 1964. (Uncontested)

144. On May 27, 1968, a meeting was held with representatives present from the Pennsylvania Department of Transportation, the Corps, Tioga Borough Council, the Lower Tioga River Valley Regional Planning Commission, and Tioga Township Commissioners. (Uncontested)

145. On March 11, 1970, Pennsylvania Department of Transportation officials met with the Tioga County Planning Commission, Richmond Township Supervisors and three property owners. (Uncontested)

146. Mr. Nat Marvi of the Pennsylvania Department of Transportation outlined plans for relocated Route 15, the location decided upon, and the reasons for such choice. (Uncontested)

147. The proposed locations of interchanges for relocated Route 15 were discussed at the same meeting.

148. At this time, Department of Transportation officials asked for comments on the recommended corridors. (Uncontested)

149. Again, on April 16, 1970, Department of Transportation officials met with the Tioga Borough Supervisors, the Tioga County Planning Commission and Lawrence Township Supervisors to discuss further plans re the relocation of Route 15. (Uncontested)

150. Discussed topics were the eventual disposition of old 15, justification for service road, approximate date of construction, and feasibility of additional access locations. (Uncontested)

151. On February 4, 1971, the Pennsylvania Department of Transportation sent publication notices to the Elmira Star Gazette, Wellsboro Gazette and The Mansfield Advertiser for opportunity to appear at a Design Public Hearing regarding relocation of Route 15. (Uncontested)

152. On February 10, 1971, said notice was published in The Mansfield Advertiser. (Uncontested)

153. The Pennsylvania Department of Transportation contacted all state and local agencies between March, 1970, and May, 1971, and received no notice of adverse environmental effects likely to result from the proposed relocation. (Uncontested)

154. October 22, 1971, the Williamsport Sun Gazette reported a Kiwanis Club meeting wherein Department of Transportation officials explained present plan for completion of relocated Route 15. (Uncontested)

155. The total cost of constructing relocated Route 15 will be $19,483,844.55. (Uncontested)

156. As of January 6, 1976, the Pennsylvania Department of Transportation has expended $16,942,106.72. (Uncontested)

157. There remains only 800–1,000 feet of roadway to be constructed in order to complete relocated Route 15. (Uncontested)

158. As of February, 1976, the construction completion percentage is therefore 91.4%. (Uncontested)

159. There are no homes or properties remaining in the 800–1,000 foot area where the highway project remains incomplete. (Uncontested)

160. On April 27, 1970, the Pennsylvania Department of Transportation's Central Office approved the proposed design. (Uncontested)

161. In April, 1970, a tentative planning and construction schedule was outlined.

162. Tentative construction of relocated Route 15 was to begin October, 1972, and be completed by February, 1976.

163. On September 24, 1970, Department of Transportation's District Office requested the Pennsylvania Department of Transportation's Central Office to advertise for the Design Public Hearing.

164. The Pennsylvania plan for constructing a limited access highway between Mansfield and Tioga to replace existing Highway 15, as originally planned, would have resulted in a loss of access for homeowners along that route.

165. In order to facilitate land acquisition for both the Dam Project and relocated Highway 15, the Corps and Pennsylvania agreed that it would be advantageous for everyone concerned if the Corps would substantially acquire the property needed for both projects.

166. An earth slide in the Project area just below the bed of relocated U.S. Highway Route 15 occurred during the spring and summer of 1975. (Uncontested)

167. Said slide will require millions of dollars to correct. (Uncontested)

168. When homeowners along Highway 15 agreed to waive their rights to damages against the government for lack of access, the Corps agreed to only a partial taking of their properties.

169. Homeowners along Highway 15 between Mansfield and Tioga who agreed to waive severance damages entered into the necessary conveyances which allowed them to construct an access road to their properties. (Uncontested)

170. These homeowners were informed by Corps personnel that there was no obligation on the part of the government to furnish utilities along their privately-constructed access road. (Uncontested)

171. There are at present displacees of the project abutting on new U.S. Route 15 who are able to procure utility service to their homes only upon the payment by them of the entire cost of the installation of the same.

172. It is a policy of the Corps of Engineers to see that utilities are relocated in such a manner that no individuals are deprived of service.

173. Where an area has been previously serviced by a utility and that utility is affected by the project, the Corps has seen to it that a relocated line was provided.

174. Utilities are not made available at government expense to those who choose to relocate to areas without such service.

175. If it was determined that customers would lose services of utilities, the relocation plans would be revised to provide for such services unless there had been a voluntary waiver executed by those homeowners so serviced.

176. To accommodate requests of local officials and property owners and, as a result of the Corps' action in returning land to affected property owners, the Department of Transportation constructed, at its own expense, a two-lane roadway from Kelly Township Road to Old Route 15.

177. The cost of said service road was approximately $257,000.

## UNIFORM RELOCATION ASSISTANCE ACT

178. Preliminary estimates for land acquisition included 6,150 acres for dam and lake area. (Uncontested)

179. Five hundred fifteen acres were included for public access. (Uncontested)

180. Eighty-four acres were included for local protection of Mansfield. (Uncontested)

181. One hundred ninety acres were included for railroad relocation. (Uncontested)

182. One hundred fifteen acres were included for highway relocation. (Uncontested)

183. Ninety acres were included for downstream flood plain. (Uncontested)

184. The population of the area acquired or to be acquired is 1,032 persons, consisting of 259 families.

185. Structures include 158 residences, 67 farm sets, 6 public buildings, 8 retail establishments, 10 cemeteries, and 12 other structures. (Uncontested)

186. The Real Estate Division of the Corps of Engineers, Baltimore District, was assigned the responsibility for the acquisition of the needed real property. (Uncontested)

187. A Real Estate Project Office was established in Wellsboro, Pennsylvania, in the Spring of 1969 to transact the acquisitions and to provide information and public assistance. (Uncontested)

188. The Wellsboro Office is centrally located 13 miles from Mansfield and 17 miles from Tioga so that it can conduct the real estate acquisitions for the neighboring Cowanesque Project as well as the Tioga-Hammond Project. (Uncontested)

189. The Real Estate Office at Wellsboro is easily accessible to Mansfield by primary highway U.S. Route 6. (Uncontested)

190. The Project Manager for the Tioga-Hammond project is Mr. Theodore Loukota of the Baltimore District Office. (Uncontested)

191. Mr. Loukota is also in charge of the Relocation Assistance Program and has established a Relocation Assistance Advisory Program for the planned displacees of the Tioga-Hammond Project and the Cowanesque Project.

192. This program is designed to assure that, within a reasonable period of time prior to the displacement, there will be available in areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the families and individuals displaced, decent, safe and sanitary dwellings reasonably accessible to their places of employment.

193. Mr. Loukota's qualifications are:

a. He has served in various capacities as a realty officer and negotiator for the government for the last 15 years.

b. He holds a degree in Accounting from Nebraska Business College and is licensed as a real estate broker in Nebraska. (Uncontested)

194. He employs a staff of persons, including appraisers and negotiators, to assist him in the implementation of the Relocation Assistance Program. (Uncontested)

195. No family has been relocated from the project area against its will into a dwelling which is not decent, safe and sanitary.

196. The relocation assistance program is kept current by continuing coordination with all local realtors, by inspection of homes and scanning of newspapers.

197. 230 of the 259 families affected by the project have relocated.

198. Of the remaining 29 families, 13 have already secured new sites or have contract commitments for the construction of new homes.

199. Mr. Theodore Loukota is also the Project Manager for the Cowanesque Project. (Uncontested)

200. Available housing has been inspected as it became necessary and in each case a determination made as to whether or not it is decent, safe and sanitary.

201. There is adequate information maintained on available decent, safe and sanitary housing.

202. The Tioga-Hammond relocation program has functioned notwithstanding the Agnes Flood of 1972 and the Eloise Flood of 1975.

203. Various public meetings have been held to discuss the required relocations, relocation benefits, and to provide all necessary coordination with the public.

204. Many informal meetings have also been held to provide the necessary assistance in effecting relocations.

205. The Wellsboro Office has developed a 16-page brochure which discusses a list of relocation advisory assistance services provided by the Corps and all the benefits accorded a qualified displacee. (Uncontested)

206. The brochure is disseminated to all persons who are displaced and is also distributed at public meetings and informal gatherings. (Uncontested)

207. A series of articles explaining relocation benefits was distributed to newspapers of general circulation in the area.

208. This series was published in the Elkland Journal in November and December of 1974.

209. The Mansfield Protective Works were detailed in Design Memorandum No. 12, dated April, 1972.

210. Two meetings were held in 1971 to acquaint Mansfield officials with the features of the Mansfield Protective Works and to incorporate their views into the final design, if practicable.

211. Views of local Mansfield officials were incorporated into the final design of the protective works.

212. Alternate protective plans for Mansfield were considered.

213. The area known as Smythe Park is located in a flood plain and is presently subject to inundation.

214. The proposed ponding in Smythe Park as regulated by the pumping station will have no adverse effect on this area.

## ADDITIONAL CLAIMS FOR RELIEF

215. Between September, 1965 and January, 1976 many meetings were held by the Corps in the Mansfield area.

216. These meetings have dealt with general presentation of the Mansfield protective plans as well as with specific problems involved in implementation.

217. A meeting was held on December 14, 1971, between the Corps and Mansfield Borough officials at which the present protective plans were presented and discussed.

218. As a result of the December 14, 1971 meeting, the Corps agreed to consider an alternate design for the Corey Creek Conduit.

219. Employees of the Corps have always been willing to attempt to answer any questions concerning its plans for Mansfield as well as any general inquiries regarding the Dam and associated relocations and acquisition.

220. Personnel from the Corps have come from Baltimore to attend meetings and have invited members of the public to express their views at the Wellsboro Real Estate Office and the Area Engineer's Office in Tioga. (Uncontested)

221. Since 1973, models of the Tioga and Hammond Dams, as well as a model of the Mansfield Protective Works, have been on display at the Area Engineer's Office in Tioga. (Uncontested)

222. These models have also been displayed in public locations throughout Mansfield and the Tioga County Area. (Uncontested)

223. In negotiating with local governmental units in the project area, Corps personnel have been and are now willing to consider changes in design and construction if such changes can be justified from engineering, environmental and economic viewpoints.

224. The Pennsylvania Legislature enacted an Open Meeting Law effective 60 days from July 19, 1974 (65 Purdon's Statutes, §§ 261–269) which required such governmental entities as the Mansfield Borough Council, Southern Tioga County School District, Mansfield Water Authority, among others, to take formal actions only at public meetings. (Uncontested)

225. On March 29, 1974, Eugene Korb, Chairman of Plaintiff, met with F. E. Plumley of S. J. Groves & Sons, Inc., the prime contractor, and informed Plumley of his intent to attempt to secure an injunction against further construction of the project.

## II. DISCUSSION

The Tioga River flows northerly through Tioga County in North Central Pennsylvania, past the Boroughs of Mansfield and Tioga and enters the Chemung River near Corning, New York. The Chemung, in turn, runs southeasterly past Elmira, New York and empties into the North Branch of the Susquehanna River just south of the Pennsylvania-New York border near Sayre, Pennsylvania. The area drained by the Tioga, Chemung, and Susquehanna Rivers was subjected to severe flooding during Hurricane Agnes in June, 1972, and Hurricane Eloise in September, 1975.

At a point approximately ¾ of a mile south of Tioga and seven miles north of

Mansfield, construction, variously known as the Tioga-Hammond Lakes and the Tioga-Hammond Dam Project, is underway. The project consists of two rolled-earth and rockfill dams which are nearly side-by-side. The Tioga Dam is on the river of the same name. The Hammond Dam is on Crooked Creek, a tributary of the Tioga which flows in close proximity to the larger river but which, at that point, is over three miles from the mouth of the creek.

The Tioga-Hammond project was authorized by Congress on July 3, 1958. It forms a portion of a projected system of reservoirs whose purpose is to reduce flood damage in the North Branch of the Susquehanna River Basin. Construction is under the auspices of the United States Army Corps of Engineers. The project is presently conceived as a "wet lake" system. Upon completion some gates in the dams will be closed and water will accumulate to a predetermined level. In addition to flood control, recreational benefits are envisioned from the two reservoirs which will be created behind the respective dams. Because the Tioga River is afflicted by mine acid drainage, the water in the two lakes will differ in quality. Consequently, measures are being taken in the construction of the channel connecting the lakes to ensure that the only flow between the two bodies will be of the purer water from the Hammond reservoir into the Tioga pool. The water level of the two lakes will vary according to the season, being greater during recreational months.

The completed project will require the acquisition by the Corps of an estimated 6,150 acres of land. Approximately 1,032 individuals comprising 259 families will have been displaced by the project. Also, various segments of U.S. Route 15, the major north-south artery serving this region, have been condemned by the Corps. The loss of approximately 6 miles of this roadway has necessitated the laying of 8.2 miles of new highway by the Defendant Pennsylvania Department of Transportation (PennDOT) in order to ensure that Route 15 runs uninterruptedly through this area.

Many areas of Mansfield Borough have an elevation lower than the anticipated water level of the Tioga reservoir at flood stage. Consequently, to protect the town during periods of high water, a system of levees, conduits, and pumping stations, known as the Mansfield Protective Works, is planned. The levees will be constructed along the east bank of the Tioga River. Smythe Park, a playground and recreational area used extensively by the residents of the community, lies directly next to and east of the Tioga River near the northern end of Mansfield. The construction of the broad-based levees will require the taking of a small section of Smythe Park. However, when completed, the Mansfield Protective Works will reduce the frequency and degree of inundation at Smythe Park.

Work on the Tioga-Hammond Dam Project began on September 14, 1971. The total estimated cost upon completion is $157,700,000. As of December 31, 1975, $77,074,700 had been expended by the Corps. A majority of the construction contracts required for completion has been let. The dam foundations have been excavated. All but 29 of the 259 displaced families have been relocated. Only 800 to 1000 feet of relocated Route 15 remain to be laid. No significant work has, as yet, been done on the Mansfield Protective Works.

The National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4331 et seq., which became effective January 1, 1970, requires that a "detailed statement" be prepared before "major Federal actions significantly affecting the quality of the human environment" are undertaken. The final Environmental Impact Statement (EIS) for the Tioga-Hammond Dam Project was filed with the Council on Environmental Quality (CEQ) June 2, 1971. It has not been revised. No Environmental Impact Statement has been filed by the Pennsylvania Department of Transportation (PennDOT) with respect to relocated Route 15.

In October, 1975, approximately 225 individuals claiming to be affected by the project formed the Mansfield Area Citizens Group. This organization filed the above-

captioned case on February 5, 1976. Based on the alleged inadequacy of the EIS and instability of the proposed dams, the Plaintiff seeks certain declaratory and injunctive relief with respect to the project's "wet lake" concept, the Mansfield Protective Works, the relocation of displaced individuals, the construction of relocated Route 15, and the manner of treatment accorded certain individuals whose utility service is adversely affected. Plaintiff's claim for money damages has been withdrawn.

## A. Standing.

■ An organization whose members have allegedly incurred injury as the result of actions by a federal agency may represent those members in a suit to enjoin such activities. *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). If the alleged injuries are arguably within the "zone of interest" sought to be protected by the statutes invoked, the organization has standing to sue. *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Data Processing Service v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

■ There is no doubt that some members of the Plaintiff group are affected by and, if the allegations of the Complaint are taken as true, will be injured by the action of the Defendants, particularly the Federal Defendants, with respect to Smythe Park. Furthermore, there can be no doubt that the environmental concerns which Plaintiff seeks to protect are well within the "zone of interest" sought to be protected by the National Environmental Policy Act. Consequently, PennDOT's request that this suit be dismissed because the Plaintiff lacks standing to sue will be denied.

## B. Equal Protection.

■ The Plaintiff contends that the Corps has unequally treated certain unspecified groups of individuals who have been displaced by the project or whose utility service has been affected. No credible evidence supporting this contention was presented at trial.

## C. Waivers.

■ Where the partial taking of a parcel would render the remainder land-locked, it is the policy of the Corps of Engineers to condemn the entire tract. Certain landowners in the Mansfield area, nevertheless, desired to retain such land-locked properties. The Corps agreed to refrain from an entire taking only if those landowners signed a waiver of the Corps' liability for access to the remaining land-locked parcels. Those landowners entered into an agreement among themselves to provide access by private right of way. The Plaintiff contends that the waivers obtained by the Corps are the product of coercion and thus unenforceable. The Court finds no credible evidence to support this claim. Furthermore, the validity or non-validity of the waivers has no relevance to the equitable considerations involved in this suit for injunctive relief.

## D. Safety of the Dams.

■ The Plaintiff introduced no evidence upon which to base a finding that the proposed dams are unstable or otherwise hazardous. The preponderance of the evidence clearly lay on the side of the Corps which presented credible testimony concerning safeguards which have been incorporated in the design of the two dams. A recent landslide just slightly downstream from the project site and on the hill which forms one of the sides of one reservoir does not undercut the Corps' conclusions concerning the safety of the dams.

## E. Uniform Relocation Assistance Act.

■ The Uniform Relocation Assistance Act, 42 U.S.C. §§ 4621 et seq., requires that, in order to ensure the fair and equitable treatment of individuals displaced by a Federal or federally-assisted project, the appropriate Federal agency institute a relocation assistance advisory program. The primary duty of such a program is to assure that decent, safe, and sanitary housing is available to displacees in areas of generally simi-

lar quality to the location of their former residences and reasonably accessible to their places of employment.

■ A relocation assistance advisory program serving displacees of the Tioga-Hammond Project, as well as those of the nearby Cowanesque Project, likewise under the aegis of the Corps, has been in existence since soon after land acquisition began in 1969. The program and its implementation have complied in all respects with the requirements of the Uniform Relocation Assistance Act. Although 230 of the 259 families displaced by the project have relocated, no witness testified that he was displaced prior to the Corps' providing him with an opportunity to acquire or rent a decent, safe, and sanitary alternative dwelling in an area comparable to his former residence. With respect to this project, there is no likelihood that the Corps will, in the future, displace any individual in violation of the Uniform Relocation Assistance Act. Consequently, there is no necessity for injunctive relief covering the Corps' relocation efforts.

### F. Laches.

■ Where there is inexcusable delay in the filing of an injunction suit to the prejudice of other parties, laches acts as a bar to that action. *Clark v. Volpe,* 342 F.Supp. 1324 (E.D.La.), aff'd 461 F.2d 1266 (5th Cir. 1972). The doctrine of laches is a recognized defense in an environmental suit in this Circuit. *Pennsylvania Environmental Council v. Bartlett,* 315 F.Supp. 238 (M.D.Pa.1970), aff'd 454 F.2d 613 (3d Cir. 1971); *Harrisburg Coalition against Ruining the Environment v. Volpe,* 330 F.Supp. 918 (M.D.Pa.1971). Laches is determined in the light of all the existing circumstances and, in order for it to be invoked, there must be unreasonable delay which would lead to prejudice to opposing parties if injunctive relief were granted. *Sobosle v. U. S. Steel Corporation,* 359 F.2d 7 (3d Cir. 1966); *Pennsylvania Environmental Council v. Bartlett, supra.*

■ The evidence is overwhelming that members of the Plaintiff group had or should have had knowledge of the proposed plans for the dams, the highway, and the protective works. Numerous public meetings, discussions with elected officials, articles in newspapers of general circulation in the area, and display models all were used over a period of years to bring those matters to the attention of the general public. Massive construction work has been going on for years. The assertion by representatives of the Plaintiff that the extent of the impact on Smythe Park only recently became public knowledge is unsupported by the evidence.

Of great weight is the proof that the Corps would be substantially harmed by the issuance of an injunction on grounds which were available long ago but were tardily invoked. Nearly half of the project's expected outlays of $157,700,000 have been made; most contracts for future work have been awarded; the dam foundations have been excavated and borrow areas for the rock and earth to be used in the dams have been opened; and land acquisition and relocation of displaced persons is nearly complete. Delay itself is always costly but, in this situation, it would be compounded by the extent of the work already done and the number of sub-contractors·and workers involved.

Under the circumstances of this case, the Court is of the view that it would be inequitable to permit the Plaintiff to proceed with this suit. To the detriment of the Corps, the members of the Plaintiff group have unreasonably delayed filing this suit. In the absence of any protest to its actions, the Corps has, over the years, continued to commit itself extensively with respect to this project. Cf. *Holmberg v. Armbrecht,* 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946). This Court has previously stated in a NEPA suit, where, however, no issue of laches was raised, that "Federal action affecting the environment, if requiring an environmental impact statement, must be enjoined pending preparation of such a statement unless rare and unusual circumstances exist." *Concerned Residents of Buck Hill Falls v. Grant,* 388 F.Supp. 394 (M.D.Pa.1975). But, even if that statement,

made in the context of a suit against a *proposed* dam, is applicable to this situation, the Court is of the view that the extent to which this project has progressed and the Plaintiff's inordinate tardiness in bringing suit are such "rare and unusual" circumstances. In *Steubing v. Brinegar*, 511 F.2d 489 (2d Cir. 1975) and *I–291 Why? Association v. Burns*, 372 F.Supp. 223 (Conn.1974), the plaintiffs failed to file their suits soon after plans for the projects in question were made known to the public. Their delays were nevertheless excused because "positive developments" such as tree removal or dredging did not actually occur to "galvanize" opposition until a short time before the filing of the suits. However, in this case, such "positive developments" at the Tioga-Hammond Dam site occurred years ago.

Even if one concedes that environmental litigation enjoys a special status with respect to laches, cf. *I–291 Why? Association v. Burns, supra* ; *Steubing v. Brinegar, supra* ; *Life of the Land v. Volpe*, 363 F.Supp. 1171, 1176 (D.C.Hawaii, 1972), aff'd 485 F.2d 460 (9th Cir. 1973), cert. denied, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *Arlington Coalition v. Volpe*, 458 F.2d 1323, 1329 (4th Cir. 1972), the public interest nature of the Plaintiff's suit is insufficient to overcome the application of that doctrine to this case. It must be noted that the Plaintiff does not have a corner on the public interest surrounding the project. Consequently, there is great doubt that the Plaintiff could carry its burden if the question of harm to the public interest were reached for purposes of determining the propriety of an injunction. *Ammond v. McGahn*, 532 F.2d 325 (3rd Cir. 1976); *A. O. Smith Corp. v. FTC*, 530 F.2d 515 (3rd Cir. 1976). The protection which these dams will provide to downstream residents and property which would be delayed by the issuance of an injunction is unquestionably significant and may outweigh concerns advanced by the Plaintiff.

The Plaintiff seeks to avoid the doctrine of laches by arguing that the Court can tailor its injunctive relief in such a way as to minimize the harm to the Defendants. It argues that the Court can issue a limited order enjoining, until a proper EIS is filed, only those activities which would foreclose certain alternatives to the project as planned. The Plaintiff argues that, under such an order, construction could continue at little cost to the Corps. However, the mind boggles when the content of that order and the definitions of the impermissible actions are contemplated. An injunction must be specifically and clearly drawn so that the parties to whom it speaks may know precisely what is expected of them. Failure to comply is grounds for contempt. The generalized nature of the injunctive relief suggested to the Court by the Plaintiff in response to the assertion of laches does not meet those standards. Great difficulties would arise in determining what activities are prohibited by such an injunction. Realistically, because members of the Corps would be unable to ascertain with any degree of assurance what actions by them constitute violations of such an order, that type of injunction would amount to a shutdown of nearly all construction. Furthermore, in the context of this case, an order of that nature would have the appearance of elevating form over substance. The Corps has extensively evaluated alternatives to its final plans and has reduced those considerations to writing in so-called Design Memoranda. Requiring the revision of the present Environmental Impact Statement would amount to nothing more than a compilation, collation and representation of matters now contained in those Design Memoranda.

In making this ruling, the Court is fully cognizant of the importance of preserving and protecting the environment and of the fact that the EIS in question here falls far short of the modern prototype for such documents. However, as stated in *Clark v. Volpe, supra*, the public concern for environmental matters is not served when suit is delayed until substantial alterations to the environment have irreversibly occurred.

826

## G. Defendant Pennsylvania Department of Transportation.

■ The Pennsylvania Department of Transportation is a party to this suit solely by reason of its control over the laying of relocated Route 15. The Plaintiff fails to make a convincing demonstration of the need for injunctive relief against PennDOT.

The condemnation of the right-of-way for relocated Route 15 and the relocation of persons affected thereby has been carried out completely by the Corps. The only funds received by PennDOT for building this highway are condemnation monies based upon replacement costs—in effect, dollar-for-dollar payments by the Corps for construction costs incurred by the Commonwealth to build the 8.2 miles of new Route 15. No Federal highway funds have been used to complete this stretch of roadway. Consequently, PennDOT's activities with respect to relocated Route 15 probably do not amount to such "major Federal action" as would require the Commonwealth to file an Environmental Impact Statement with respect to the highway. However, because the Plaintiff has not demonstrated that further irreparable environmental impact will occur if the injunction it seeks with respect to relocated Route 15 is denied and consequently has failed to make a case for injunctive relief against PennDOT, see *Ammond v. McGahn*, 532 F.2d 325 (3d Cir. 3/11/76) and *A. O. Smith Corp. v. FTC*, 530 F.2d 515 (3d Cir. 2/11/76), the Court need not ultimately resolve that question.

The only remaining step to finish relocated Route 15 is the pouring of a two-lane concrete strip approximately 800–1000 feet in length. No further displacement of residents will be caused by the road's completion nor is any more grading required. Any environmental damage inflicted by the relocation of Route 15 is history.

■ For the same reasons given with respect to the injunctive relief sought against the Corps, the Plaintiff's action against PennDOT is barred by laches. There is no significant difference either in quantity or quality between the efforts to give notice by the Corps and PennDOT's

attempts to educate the public with respect to the relocation of Route 15. Likewise, the prejudice to the Commonwealth from an injunction at this stage would be significant.

Any argument that the Commonwealth is responsible to individuals near relocated Route 15 for the loss of access and utility service is a legal question and is not properly a part of this suit for injunctive relief.

## III. CONCLUSIONS OF LAW

The Court reaches the following Conclusions of Law:

1. The Court has jurisdiction. (Uncontested)

2. Venue to entertain this case lies in this Court. (Uncontested)

3. The Plaintiff has standing to sue.

4. There has been no violation of the Equal Protection Clause of the United States Constitution by either the United States Army Corps of Engineers or by the Pennsylvania Department of Transportation with respect to any member of the Plaintiff.

5. Waivers signed by certain landowners in the Mansfield Area with respect to the liability of the United States Army Corps of Engineers for access to their property were not the product of coercion by the Corps.

6. With respect to the Tioga-Hammond Dam Project, the Corps has not displaced any individual prior to providing him with an opportunity to acquire or rent a decent, safe and sanitary alternative dwelling in an area comparable to his former residence.

7. With respect to the Tioga-Hammond Dam Project, there is no likelihood that the Corps will displace any individual prior to providing him with an opportunity to acquire or rent a decent, safe, and sanitary alternative dwelling in an area comparable to his former residence.

8. With respect to individuals affected by the Tioga-Hammond Dam Project, the Corps has complied with the provisions of the Uniform Relocation Assistance Act, 42 U.S.C. § 4621 et seq.

9. The Plaintiff's suit for injunctive relief against the United States Army Corps of Engineers is barred by laches.

10. The Plaintiff's suit for injunctive relief against the Pennsylvania Department of Transportation is barred by laches.

11. The Plaintiff has not demonstrated that irreparable injury will occur if the completion of relocated Route 15 by the Pennsylvania Department of Transportation is not enjoined.

An appropriate order denying relief will be entered.