HEADWATERS, INCORPORATED, Plaintiff,

v.

BUREAU OF LAND MANAGEMENT, MEDFORD DISTRICT; David A. Jones, District Manager, in his official capacity, officers and agents of the Bureau of Land Management, Medford District, in their official capacities, and Boise Cascade Corporation, Defendants.

Civ. No. 87–6263–MA.

United States District Court, D. Oregon.

July 20, 1987.

Charles G. Levin, Headwaters, Inc., Grants Pass, Or., for plaintiff.

Phillip D. Chadsey, Joan P. Snyder, Stoel, Rives, Boley, Jones & Grey, Portland, Or., for defendant Boise Cascade Corp.

Charles H. Turner, U.S. Atty., Thomas C. Lee, Asst. U.S. Atty., Portland, Or., for defendants Bureau of Land Management, Medford Dist., David A. Jones, and Officers and Agents of the Bureau of Land Management, Medford Dist.

## OPINION

PANNER, Chief Judge.

On June 3, 1987, plaintiff Headwaters, Inc. (Headwaters) filed a motion for a temporary restraining order and preliminary injunction to prevent logging of the Humpy Mountain timber sale site in the Medford District of the Bureau of Land Management (BLM). The timber sale had been awarded to Boise Cascade Corp. (Boise Cascade). On June 23, Judge Marsh heard oral argument and testimony. At the time of the hearing, Judge Marsh disclosed to the parties that his wife had a minor interest in Boise Cascade as stockholder. Each party orally agreed that Judge Marsh should proceed with the case. On July 1, he denied the motion.

■ Subsequently Judge Marsh, aware of the importance attached to the appearance as well as actual propriety in the federal courts, brought this situation to my attention. Congress has taken an extreme position in enhancing the image of the court. *Davis v. Xerox*, 811 F.2d 1293, 1296 (9th Cir.1987). A financial interest "however small" of a judge or a judge's spouse is generally grounds for disqualification, 28 U.S.C. § 455(b)(4), and it is not waivable. Following consultation with the parties, I have undertaken a *de novo* determination. The parties orally stipulated that this would be done on the record, including the transcript of the June 23 hearing. Boise Cascade also stipulated that no logging or further activity will take place for ten days, starting at 10:05 a.m. on July 9, 1987.

Headwaters seeks to prevent defendants from logging the Humpy Mountain timber sale site until its claim under the National Environmental Policy Act (NEPA) can be resolved. Plaintiff contends that it will be irreparably damaged if the logging is allowed, and that hardship to the defendants would be small if the injunction is granted. Plaintiff contends that it is likely to succeed on the merits because BLM's environmental assessment (EA) of the project is legally inadequate because it failed to consider reasonable alternatives to the project which may have a less injurious effect on the environment, in violation of NEPA, 42 U.S.C. § 4332(2)(E) and supporting regulations. Plaintiff also alleges that BLM was arbitrary and capricious in its use of infor-

mation concerning soil properties on the sale site, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Following a complete evaluation on the record, I deny the motion for an injunction.

## BACKGROUND OF THE CASE

In November 1979, BLM issued the Final Environmental Statement, Jackson and Klamath Sustained Yield Units Ten Year Management Plan (EIS). BLM decided to implement the timber sale proposal on the Humpy Mountain site. Based on the EIS and a site-specific EA, the Medford District BLM manager made a Finding Of No Significant Impact (FONSI) on the Humpy Mountain sale site. The sale was advertised and the high bidder was awarded the contract. The decision to implement the sale was appealed to the Interior Board of Land Appeals (IBLA) by a group of opponents called the Thompson Creek Residents for Ecological Education (TREE). They alleged that the EA was inadequate. On June 28, 1985, the IBLA remanded the decision to the BLM for it to consider the failure of the EA to consider adequately site-specific impacts which varied significantly from those considered by the EIS. To comply with the IBLA opinion, BLM eliminated certain tracts from the sale. Also to comply with the opinion, on May 31, 1985, BLM issued a Supplemental Environmental Impact Statement (SEIS).

Based on both the EIS and the SEIS, BLM prepared an addendum to the EA. On May 13, 1986, the BLM manager again issued a FONSI. Because the original high bidder had meanwhile withdrawn, the sale was readvertised and on June 17, 1986, awarded to Boise Cascade. The sale is for 3.784 million board feet on 122 acres for the price of $236,168.

TREE and Headwaters again appealed the decision to IBLA, raising some of the issues now raised in this motion for an injunction. On October 6, 1986, the IBLA held that additional issues which were or should have been raised in the prior case were barred by the doctrine of administrative finality or by failure to file a timely appeal. Plaintiff sought reconsideration of this opinion, which was denied on December 22, 1986.

Between the time of the IBLA decision and plaintiff's filing of this motion on June 3, 1987, Boise Cascade contracted for road-building on the site at a cost of $47,382, which at the time of filing was ninety percent complete and since has been finished. It also contracted with independent loggers and haulers for $391,570, although none of this work has been done. Additionally, it deposited $12,000 with BLM for security.

## STANDARDS

The equitable criteria for granting preliminary relief consist of a showing of either a combination of probable success and possible irreparable injury, or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party seeking relief. *Aleknagik Natives Ltd. v. Andrus*, 648 F.2d 496, 502 (9th Cir.1980). If the balance of hardships tips decidedly toward the plaintiff, less likelihood of success on the merits is required. *Wilson v. Watt*, 703 F.2d 395, 399 (9th Cir.1983). I may also consider in some cases a showing by the plaintiff that granting the preliminary injunction will be in the public interest. *Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1200 (9th Cir.1980).

## DISCUSSION

1. *The Balance Of Hardships.*

Plaintiff consists of avid outdoor enthusiasts who recreate in the Humpy Mountain area. The logging includes clearcutting 108 acres. Some of the stand includes old growth trees. Some portions of the streams in the sale area support steelhead, salmon and trout. Plaintiff argues in general terms that the logging will cause irreversible damage to the area. The destruction of mature forests in the public domain through which streams and wildlife run is a significant hardship to outdoor enthusiasts and the public as a whole.

Nevertheless, plaintiff delayed nearly half a year before bringing this suit. Boise Cascade's hardship would have been largely avoided had plaintiff acted promptly. Boise Cascade urges this court to bar the suit for laches, which I decline to do. Laches is to be applied infrequently in environmental cases. *Coalition For Canyon Preservation v. Bowers*, 632 F.2d 774, 779 (9th Cir.1980). The cases cited by Boise Cascade in which the courts invoke the doctrine of laches involve far longer delays of projects which were much closer to completion than this one. *Mansfield Area Citizens Group v. United States*, 413 F.Supp. 810 (M.D.Pa.1976); *Iowa Student Public Interest Research Group v. Callaway*, 379 F.Supp. 714 (S.D.Iowa 1974). Nevertheless, delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief. *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir.1984).

Boise Cascade contends that it would lose more than $219,000, including lost profits, if the preliminary injunction is granted. In addition, employees of subcontractors would be unemployed. Plaintiff contends that granting injunctive relief does not foreclose logging but only requires BLM to comply with lawful decisionmaking procedures, and that therefore the losses to Boise Cascade might be minimal. I am mindful that purely monetary losses are not usually considered irreparable, especially when there is the possibility of some recovery. *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974). Nevertheless they are significant and there is no promise of any recovery. In addition, they were caused by plaintiff's delay. I conclude that the balance of hardships does not tip decidedly toward the plaintiff, and therefore there must be a stronger showing of likelihood of success on the merits. *Wilson v. Watt*, 703 F.2d at 399.

### 2. *Likelihood Of Success On The Merits.*

In three of its four claims for relief, plaintiff contends that BLM's EA was legally inadequate because it failed to consider alternatives to the project or did not consider them meaningfully, because the discussion of environmental consequences was inadequate, and because it failed to discuss the "no-action" alternative, all in violation of the NEPA and regulations. The choice between incompatible alternative uses of public resources is a difficult one. The elaborate studies mandated by the NEPA were designed to facilitate just such decisions.

These claims for relief present questions of law which are reviewable *de novo*. *Oregon Environmental Council v. Kunzman*, 817 F.2d 484, 493 (9th Cir.1987). The court may properly look beyond the record insofar as it is intended to show that the BLM's research or analysis was inadequate. *No Oilport! v. Carter*, 520 F.Supp. 334, 346 (W.D.Wash.1981). I consider the administrative record as supplemented by affidavits and the June 23 hearing for this limited purpose only.

Plaintiff attacks the EA prepared for this sale as inadequate on the grounds that it shows "on its face" that the BLM did not present or consider any alternatives that would reduce the environmental impact of the project, and because its presentation of alternatives was "shallow, cursory, unanalytical, and evidences that the BLM never considered reasonable alternatives to the proposed course of action." It contends also that the discussion in the EA concerning the "no-action" alternative was not discussed in connection with a particular sale but was a "mere strawman alternative."

Plaintiff directs its criticism to the EA rather than to the EIS and SEIS. It is important to understand how these documents relate to an agency decision. The EA is defined in 40 C.F.R. § 1508.9(a) (1986) as:

a concise public document for which a Federal agency is responsible that serves to (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact, [and] (2) Aid an agency's compli-

ance with the Act when no environmental impact statement is necessary.

The EA must also:

include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E)[1] of environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

40 C.F.R. § 1508.9(b) (1986). If the EA indicates that more comprehensive study is needed, an EIS is prepared. Alternatively, the agency may instead make a finding of no significant impact, in which case an EIS is unnecessary. In practice, however, the agency will usually prepare a "programmatic" EIS such as the Jackson and Klamath Sustained Yield Units Ten Year Management Plan, upon which site-specific EAs are subsequently "tiered."[2] This procedure is specifically encouraged by 40 C.F.R. § 1502.20 to eliminate repetitive discussions.

[The] environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action.

Id. In this case there was also a supplemental EIS (SEIS). Both of these statements were specifically incorporated by reference throughout the disputed EA. Therefore I must examine these documents to determine whether, taken as a whole, they "provide the information necessary reasonably to enable the decisionmaker to consider the environmental factors and to make a reasoned decision," Souther Oregon Citizens Against Toxic Sprays, Inc. SOCATS v. Clark, 720 F.2d 1475, 1480 (9th Cir.1983), and a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." Oregon Environmental Council v. Kunzman, 817 F.2d at 492. It is not appropriate to hold it insufficient for inconsequential, technical deficiencies. Id.

Plaintiff is correct that the EA's discussion of alternatives is weak. Four alternatives to the project are briefly mentioned under the section entitled "alternatives considered but eliminated." Actually those "alternatives" mostly would increase, rather than decrease, the environmental impact. No reference is made to shelterwood cutting, which is the plaintiff's preferred alternative. No reference is specifically made at that point to the EIS or SEIS, where shelterwood and other alternatives are discussed. Similarly the "no action" alternative is flawed because it presumes a substitution of other tracts in order for the BLM to meet its area timber harvest goal. In this discussion the EA does expressly make reference to the EIS, where these issues are much more thoroughly discussed. Despite these significant shortcomings, through the tiering process the BLM has provided a reasonably thorough discussion of the significant aspects of the probable environmental consequences. More importantly, a reviewing court should give considerable weight to the administrative review process that this sale has already undergone. Plaintiff already appealed BLM's decision to the IBLA on different grounds. The IBLA remanded and required BLM to consider additional factors. On remand, BLM eliminated certain areas from the sale site and modified the EA. Plaintiff raised some of the current issues

1. Section 102(2)(E) provides:
[A]ll agencies of the Federal Government shall—
. . .
(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.

2. "Tiering" is defined in 40 C.F.R. § 1508.28:
"Tiering" refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements of environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared. Tiering is appropriate when the sequence of statements of analyses is:
(a) From a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis.

in a subsequent appeal and request for reconsideration. On October 6, 1986, the IBLA held that plaintiff should have raised those issues in the prior case and was barred by the doctrine of administrative finality or by failure to file a timely appeal. Although a court is not bound by the administrative review, a formal review is a factor to be considered. *Friends of the Earth, Inc. v. Coleman*, 518 F.2d 323, 329 (9th Cir.1975). Plaintiff's delay in bringing suit is also a factor to be weighed. *Vance v. Block*, 635 F.Supp. 163, 166 (D.Mont. 1986). I conclude that plaintiff's likelihood of success on the merits of the first three claims is not great.

Plaintiff's fourth claim for relief challenges BLM's application of information regarding soil types in the drainage as arbitrary and capricious, in violation of the Administrative Procedure Act. Plaintiff concedes that the court is limited to the record on this issue. *Asarco v. EPA*, 616 F.2d 1153 (9th Cir.1980). For the purposes of this claim I disregard all affidavits and testimony beyond the administrative record. Plaintiff contends that BLM's own maps indicate that the dominant soil types in the sale area have severe or moderate-to-severe erosion hazard. On August 22, 1986, in a statement to the IBLA, BLM addressed plaintiff's allegation, and stated that a detailed investigation of soil type on the site revealed low to moderate erosion potential even though the original soil survey, which was highly generalized in nature, showed them to be more severe. The agency's action was not arbitrary or capricious. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Plaintiff is not likely to succeed on the merits of this claim.

## CONCLUSION

Plaintiff has failed to show either that the balance of hardships tips decidedly in its favor or that it is likely to succeed on the merits. Accordingly, its motion for injunctive relief is denied.