**THOMAS P. CARNEY, INC. and Anastasi Brothers Corporation and Peter F. Schenck**

v.

**The SCHOOL DISTRICT OF PHILADELPHIA, a School District of the First Class, Herman Mattleman, Ernestine J. Rouse, Rodney D. Johnson, Helen Oakes, Joseph H. Previty, Samuel H. Rubin, Arthur W. Thomas, Christine Torres Matrullo, Board of Education of the School District of Philadelphia, and J.J. White, Inc.**

Civ. A. No. 85–6516.

United States District Court,
E.D. Pennsylvania.

April 30, 1986.

Thomas J. McGoldrick, John H. Widman, McAleese, McGoldrick & Susanin, King of Prussia, Pa., for plaintiffs.

Cornelius C. O'Brien, Jr., Cornelius C. O'Brien, III, O'Brien and Davis, Philadelphia, Pa., for J.J. White, Inc.

Kenneth M. Cushman, Kenneth I. Levin, Andrew R. Rogoff, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for The School Dist. of Philadelphia, Herman Mattleman, Ernestine J. Rouse, Rodney D. Johnson, Helen Oakes, Joseph H. Previty, Samuel H. Rubin, Arthur W. Thomas, Christine Torres-Matrullo, Bd. of Educ. of the School Dist. of Philadelphia.

## MEMORANDUM AND ORDER

HANNUM, Senior District Judge.

This action arises from the October 11, 1985 award of the general construction contract on the Thomas Alva Edison High School and Technical Center project (Edison project) by defendant Board of Education to defendant J.J. White, Inc. (White) instead of to plaintiff Thomas P. Carney, Inc. (Carney). The plaintiffs, Carney, Anastasi Brothers Corporation (Anastasi) and Peter F. Schenck, allege that the defendant Board of Education rejected Carney's bid because it failed to meet the affirmative action requirements set forth at Section 14, paragraph II of the contract specifications. Plaintiffs concede that Carney's bid was not in compliance with the affirmative action requirements, but challenge the Board of Education's general construction contract award on the ground that the Board of Education violated Section 751 of the School Code of 1949, 24 P.S. § 7–751, by not awarding the general construction contract on the Edison project in a reasonable, non-discriminatory fashion to the lowest responsible bidder.[1] There is no

---

1. The plaintiffs also claim that the affirmative action requirements constitute an impermissible classification based on race and gender in violation of the Fourteenth Amendment. At the plaintiff's request, the Fourteenth Amendment equal protection claims were not addressed at the preliminary injunction hearing. See Docket Entry No. 20. The Court, therefore, will not address that claim and will await notice from

dispute that Carney's bid was the lowest of the four bids submitted.

The plaintiffs seek injunctive relief from the Court which would prohibit White from continuing to work on the Edison project and would direct the defendant School District of Philadelphia to proceed with the Edison project as if Carney had been awarded the general construction contract. The defendants assert the equitable defenses of laches and unclean hands and contend that a preliminary injunction is not warranted because: (1) Carney's bid was materially non-responsive to the requirements of the bidding specifications; (2) the affirmative action requirements are not violative of Section 751 of the School Code of 1949; and (3) the harm that the public will suffer if the Court grants the plaintiffs the relief they seek outweighs any potential injury to the plaintiffs. The defendants also assert that the Court does not have the authority to award the general construction contract on the Edison project to Carney and that the plaintiffs have an adequate remedy at law.[2]

This Court held a preliminary injunction hearing on December 18, 19, 20 and 23, 1985. Subsequent to the hearing, the parties submitted proposed findings of fact and conclusions of law as well as additional reply briefs. Following oral argument on February 14, 1986, the parties filed additional briefs as required by the Court. For the reasons developed in this Memorandum, the Court will not grant the plaintiffs the relief they seek.

### I. *Factual Background*

On December 19, 1983, the Board of Education passed a resolution requesting the Superintendent of Schools to present to it a final report in June of 1987 with "definite recommendations regarding awarding of contracts to minority and female owned business." The resolution further provided that:

> pending receipt of the final report from the Superintendent, the Board of Education will implement an interim measure establishing goals similar to that of the City of Philadelphia for the participation of minority and female owned businesses in the awarding of School District contracts for construction.... [and] direct the Superintendent to establish practices and procedures necessary for implementation of the interim plan including, but not limited to, developing reasonable waiver provisions for contracts and classes of contracts in appropriate circumstances.

On July 1, 1984, the Superintendent promulgated Economic Affirmative Action Standard Operating Procedures in order to "establish policies, procedures, requirements and guidelines which ensure participation by minorities and women in all areas of contracting and procurement within the School District of Philadelphia." The Superintendent noted that the standard operating procedures were predicated upon the following premises: (1) that certain racial and ethnic groups, including women, have suffered from social and economic disadvantage in a way that all others have not; (2) that there is a positive correlation between that disadvantage and the failure of the members of such groups to become successful entrepreneurs; and (3) that the goal of awarding 15% of the dollar value of

---

the plaintiffs on whether they wish to pursue the equal protection claim.

**2.** The Court does not reach the issue of whether it has the authority to award the general construction contract to Carney because of the Court's conclusion that injunctive relief is not warranted. It recognizes, however, that in upholding the issuance of a decree enjoining the defendant from awarding a contract to anyone other than the plaintiff, the Supreme Court of Pennsylvania noted in *R. & B. Builders, Inc. v. School District of Philadelphia*, 415 Pa. 50, 202 A.2d 82 (1964), that a provision permitting the

Board of Public Education to postpone action upon or to reject all bids was unimportant and not controlling because the board did not intend to reject all submitted bids and readvertise again. *Accord Kratz v. City of Allentown*, 304 Pa. 51, 155 A. 116 (1931). In the case at bar, the Board of Education rejected a resolution providing for rejection of all bids and solicitation of new bids. The defendants also introduced evidence at the preliminary injunction hearing showing the heavy cost of advertising for new bids. *See* Docket Entry No. 27 at 39–44.

the School District's contracts to minority-owned businesses and 10% to female-owned businesses will be attainable. Of particular importance to the action before the Court is the establishment in the standard operating procedures of a guideline by which the Superintendent mandated that:

a substantive criterion of compliance of all bid submissions for construction, including architectural and engineering services, in excess of $200,000 shall be the inclusion of a MINORITY AND FEMALE BUSINESS SUBCONTRACTING PLAN, whereby minorities shall be guaranteed subcontracting opportunities equal to no less than fifteen per centum (15%) of the value of the award, and whereby females shall be guaranteed subcontracting opportunities equal to no less than ten per centum (10%) of the value of the award.

On August 2, 1985, the School District began advertising for bids on the five contracts to be awarded in connection with the construction of the Edison Project. The Invitation to Bid contained a section titled Affirmative Action which included the following pertinent contract specifications:

The following paragraph is hereby a requirement of this bid specification and your [sic] are cautioned THAT FAILURE TO COMPLY AT THE TIME OF BID SUBMISSION WILL LEAD TO REJECTION OF YOUR BID.

### AFFIRMATIVE ACTION REQUIREMENT

I. It is the policy of the Board of Education, School District of Philadelphia, that business owned and controlled by minorities and women shall have the maximum practicable opportunity to participate in the performance of all types of contracts let by the School District of Philadelphia.

The Contractor hereby agrees to carry out this policy in the awarding of subcontracts to the fullest extent consistent with the efficient performance of this contract. The contractor further agrees (1) to comply with any and all affirmative action requirements imposed pursuant to this contract; and, (2) to cooperate in any studies or surveys as may be conducted by the Board of Education, School District of Philadelphia, as may be necessary to determine the extent of the contractor's compliance with this notice clause.

The Contractor understands and agrees that failure to comply with any and all affirmative action requirements may result in rejection of the contractor's bid for nonresponsiveness.

II. CONSTRUCTION CONTRACTS IN EXCESS OF $200,000.00

THAT A MATERIAL ELEMENT OF COMPLIANCE FOR BID SUBMISSION OF THIS REQUIREMENT IS THE INCLUSION OF A MINORITY AND FEMALE BUSINESS SUBCONTRACTING PLAN WHEREBY MINORITY AND FEMALE OWNED AND OPERATED BUSINESSES SHALL BE GUARANTEED SUBCONTRACTING OPPORTUNITIES EQUAL TO NO LESS THAN FIFTEEN PER CENTUM (15%) FOR MINORITY BUSINESS CONCERNS, AND TEN PER CENTUM (10%) FOR FEMALE BUSINESS CONCERNS OF THE VALUE OF THE BID SUBMISSION.

(emphasis in original). The Invitation to Bid also contained a provision by which a bidder could request a waiver of the inclusion of a minority and female business subcontracting plan if it was unable to identify applicable subcontractors. On September 6, 1985, however, the School District issued Addendum No. 5 in which it clarified the waiver provision by providing that "[n]o waivers of the sub-contracting requirement will be granted."

On September 19, 1985, Carney, White and two other contractors submitted sealed, written bids for the general construction contract on the Edison project. All four bids were higher than the architect's estimate of $18,570,200 and the con-

struction program manager's estimate of $19,924,096. The base proposal amounts for the four bids ranged from Carney's bid of $22,267,706 to Curtis T. Bedwell & Sons, Inc.'s bid of $25,000,000. White's bid was $23,400,000 and the other contractor, R.M. Shoemaker Company, submitted a bid of $22,525,000. Although Carney's bid was the lowest, its proposal did not contain a minority and female business subcontracting plan which guaranteed that female-owned and operated businesses would receive subcontracting opportunities equal to 10% of the value of the bid submission.[3] White's proposal, however, did comply with the affirmative action requirement.

The Board of Education met at a special board conference on October 11, 1985 to discuss the Edison Project. Prior to the conference, the Board's members received a memorandum which described three options with respect to the general construction contract. At the conference, Sally Akan, Esquire, general counsel to the Board of Education and preparer of the memorandum, explained the three options. The first option was to reject all bids and invite new bids. Akan, Esquire, described this option as presenting no significant legal risk, but noted that it carried the risk of delay in the progress and completion of the project and the potential for increased costs. David Sonnenthal, a School District architect in charge of overseeing bidding for and implementation of construction projects, commented that adoption of the first option would push the occupancy date from the planned date of January of 1988 to September of 1988, with no assurance of better prices and with increased administrative costs.

The remaining two options were to award the general construction contract to either White or Carney. The second option proposed by Akan, Esquire, was to award the general construction contract to White on the grounds that it submitted the lowest bid "meeting all conditions of bidder responsibility and responsiveness to the specifications." With respect to this option, Akan, Esquire, explained that there might be a challenge to an award which rejected lower bids in favor of a higher bid that was the lowest bid to meet the affirmative action requirement on the ground that the affirmative action requirement was illegal. She opined that the outcome of such an action could not be predicted with any confidence because of the lack of precedent in Pennsylvania, but that "[a]s a practical matter, the likelihood of a suit on the basis may be relatively low because such a case is likely to be lengthy and costly." The final option was to award the general construction contract to Carney, the lowest bidder, on the ground that its submission "meets the conditions of bidder responsibility, and bid responsiveness, despite failing to comply with bid specifications as to subcontracting with minority and women-owned businesses." This option was described by Akan, Esquire, as probably presenting the highest risk of legal challenge because in her opinion the bid documents did not allow the Board of Education to waive the affirmative action requirements.

Following the special board conference and a private session, the Board of Education held a special meeting at which it considered three resolutions drafted by Akan, Esquire, which corresponded to the three options, previously described by her. The Board of Education unanimously defeated a resolution which provided for the rejection of all bids on the five prime contracts and solicitation of new bids, and by a vote of eight to one it defeated a resolution which provided that the general construction contract be awarded to Carney. The Board, also by a eight to one margin, adopted a resolution awarding the general construction contract to White.

---

**3.** Carney conceded that although its subcontracting plan provided that 26.5% of the value of its bid submission would be subcontracted to minority and female-owned businesses, less than 6% of that total would be subcontracted to female-owned businesses. The Court notes that except for the fact that Carney did not comply with the 10% female business affirmative action requirement, the accuracy of Carney's figures was not at issue before the Court.

Carney initially retained Stephen B. Harris, Esquire, to represent it and on October 23, 1985, he wrote to Akan, Esquire, to inform her that Carney had "decided to bring a taxpayers['] suit against the School District of Philadelphia seeking an injunction preventing the award of the general contract to anyone other than Thomas P. Carney, Inc., or in the alternative, to have the contract rebidded [sic]." On October 31, 1985, the Director of Design and Engineering Services for the School District issued a Notice to Proceed to White. White was on the construction site as of November 1, 1985.

The plaintiff instituted this action on November 12, 1985 by filing a complaint and motion for a temporary restraining order. After receiving the defendant's response to plaintiff's motion and hearing argument from counsel for all parties, this Court denied plaintiff's motion on November 13, 1985 and set December 18, 1985, a date agreed upon by all counsel, as the date to commence a preliminary injunction hearing.

During the four day preliminary injunction hearing, the Court heard testimony from plaintiff Peter Schenck; Fred Chiarlenza, an executive vice-president of plaintiff Anastasi Brothers Corporation; John Carney, a vice-president of Carney; Richard Vanden Bosche, an expert on Critical Path Management scheduling; Dr. Samuel Beard, the executive assistant for school operations for the School District; David Sonnenthal, the project architect for the School District supervising the design of the Edison project; Joseph Trunkwalter, a general construction manager for White; and Clifford Thalwitzer, a construction manager for White. The evidence presented by these witnesses can be categorized into the following four topics: (1) the identity of the plaintiffs; (2) the background of the affirmative action requirement and of this action as previously related in this Memorandum; (3) the progress of the Edison project's construction and the probabili-

ty that it will be completed on time; and (4) the history of the Edison project and the need for it to be completed on time. The testimony was basically harmonious on three of the four topics. The third topic, however, was hotly contested.

### A. *The Identity of the Plaintiffs*

Peter Schenck lives and works in the City of Philadelphia and pays both City and State taxes. Prior to a conversation with John Carney six weeks before the preliminary injunction hearing, Schenck had only been aware that there had been "an approval for a new high school." He agreed to be a plaintiff in the lawsuit as a taxpayer because the award of the general construction contract to White was more costly to taxpayers than if the contract had been awarded to Carney.

Anastasi has its offices in the City of Philadelphia and owns the building in which the offices are located. It pays various taxes to the City and the State. Anastasi became familiar with the Edison project when it prepared the masonry portion of Carney's bid and had been promised the masonry work on the Edison project if Carney was awarded the general construction contract. Fred Chiarlenza testified that Anastasi became a plaintiff in this lawsuit because it was disturbed that Carney's bid had been rejected as a result of noncompliance with the affirmative action requirement and characterized the award of the general construction contract to White as defying "the bidding principles that we engage in every day." He conceded on cross-examination, however, that Anastasi had engaged in joint ventures with female and minority business enterprises and had offered to engage in such joint ventures on behalf of Carney on the Edison project.[4]

Carney does not pay any taxes to the City of Philadelphia, but does pay Pennsyl-

---

4. Mr. Chiarlenza commented that Anastasi's bid usually is not higher as a result of engaging in joint venture with a female or minority business enterprise.

vania corporate taxes. John Carney received the Invitation to Bid and other bid documents during the first week of August, 1985.[5] Although John Carney was aware of the affirmative action requirement and made an effort to obtain suitable subcontractors to meet this requirement, he was unable to meet the 10% female business requirement. From the time that Carney submitted its bid until the contract was awarded on October 11, 1985, Carney was never led to believe that its bid was in jeopardy of being rejected because of its noncompliance with the affirmative action requirement. Rather, discussions between David Sonnenthal and John Carney during that interval led Carney to believe that if the bid was in jeopardy of being rejected, it was because the entire Edison project was reported by Sonnenthal to be twelve to sixteen percent over budget. Carney was never notified formally that it was not awarded the general construction contract, but learned on October 11, 1985 that its bid had been rejected and by at least October 15, 1985 that the rejection was due to its noncompliance with the affirmative action requirement.

This is the second lawsuit in which Carney had been involved as a disappointed bidder trying to get a court to award it a contract that had been awarded to another contractor. Inconsistent with its position in the action before the Court, Carney tried in the prior lawsuit to disqualify a low bidder on the ground that it had not complied with affirmative action requirements.[6]

5. Carney also testified that he received Addendum No. 5 which provided that the Board of Education would not waive the affirmative action requirements.

6. The Court notes that the standing of all three plaintiffs is based on their status as taxpayers. It is undisputed that a taxpayer has a right to maintain an action to prevent an unauthorized or unlawful expenditure of state money and that it does not matter that the taxpayer is also a disappointed bidder. *Lutz Appellate Printers, Inc. v. Commonwealth,* 472 Pa. 28, 370 A.2d 1210 (1977); *Page v. King,* 285 Pa. 153, 131 A. 707 (1926); *J.P. Mascaro & Sons, Inc. v. Township of Bristol,* 505 A.2d 1071 (Pa.Common-

### B. *The History Of The Edison Project And The Need For It To Be Completed On Time*

The premise of a new Edison High School was first made by the Board of Education in 1960. With the Edison project finally a reality today, the need for it can only be understood by examining the condition of the present Edison High School and Dobbins Vocational Technical High School as well as the present unfulfilled need for additional vocational-technical training in the School District of Philadelphia.

During the 1985–1986 school year, the School District had 600 applicants for vocational-technical training for whom it had no space. At Mastbaum Vocational Technical High School, which is located in the same geographical area as the Edison project, the School District had to turn away 200 students because of lack of space in Mastbaum's vocational-technical programs. The need for more vocational-technical opportunities will be heightened due to a new Philadelphia fire regulation which required the School District to seal off the eighth floor of the Dobbins Vocational Technical High School in September of 1985 and will result in the seventh floor being sealed off by September of 1987. The loss of the seventh floor will result in 350 students not being able to attend Dobbins in September of 1987.

The condition and locations of the present Edison High School provides additional problems. The building is seventy years old and its facilities are limited. Dr. Beard, the executive assistant for school

wealth Ct.1986); *Conduit and Foundation Corporation v. City of Philadelphia,* 41 Pa.Commonwealth Ct. 641, 401 A.2d 376 (1979). A disappointed bidder, however, has not sustained an injury which entitles it to redress in court. *R.S. Noonan, Inc. v. School District of City of York,* 400 Pa. 391, 162 A.2d 623 (1960); *Mascaro.* Although Carney does not pay any taxes directly to the City of Philadelphia, it notes that State taxes are used to support public school education in Philadelphia and that it is a State taxpayer. *See* Sections 2501–2606 of the School Code of 1949, 24 P.S. §§ 25–2501—25–2606; *Danson v. Casey,* 484 Pa. 415, 399 A.2d 360 (1979).

operations, also noted that the present Edison High School is located in a heavily Hispanic neighborhood which results in many students from Kensington being reluctant to attend the present Edison High School. The result according to Dr. Beard is a high dropout rate and attendance of only 65 to 70 percent.

The Edison project is scheduled to be completed in time to admit students in January of 1988. It is anticipated that the Edison project will alleviate all of the previously described problems. The new school will be able to accommodate 1400 students and will offer a wider variety of vocational-technical programs than is presently available in the Philadelphia schools. Dr. Beard also opined that its location is in "an area that is more conducive for [a] racial mix in the school."

The current plan is that students entering tenth grade in September of 1987 would complete most of their academic work during the first half of the school year and would then move to the new Edison where they would concentrate on vocational-technical courses during the second half of the school year. Since vocational-technical courses are three year courses, the effect of not opening the new Edison by January of 1988 would be to deprive many students of the graduating class of 1990 of the opportunity to take vocational-technical courses.

C. *The Progress Of The Edison Project And The Probability That It Will Be Completed On Time*

The bidding documents contain a schedule of specific dates by which certain phases of the project must be completed "unless modified by mutual agreement between the Contractor and the Owner." According to the schedule, the award of the contract or the notice to proceed was to occur on September 30, 1985 and the project is to be completed on October 1, 1987. The schedule also provides that if the notice to proceed is issued prior to or after September 30, 1985, then all specific dates will be moved by the number of calendar days between the actual notice to proceed date and September 30, 1985.

The notice to proceed with construction was issued on October 31, 1985 and a revised construction time table was issued by David Sonnenthal on November 18, 1985 which set the final completion date as October 17, 1987. If the Edison project is to be used by students in January of 1988, the Court finds that it is crucial that the October 17, 1987 completion date be met because the School District anticipated that two months will be needed to prepare the building and its personnel after the project is completed. Failure of the Edison project to be ready for student occupancy in January of 1988 would mean that student occupancy would not occur until September of 1988.

In order to coordinate the progress of the five contractors on the Edison project, Heery Management, Inc., the construction manager for the project, used the critical path method to prepare a preliminary provisional network. The network provides a chronological path of the course of each contract and enables one to observe the interrelationship of the five contracts as well as to see what is scheduled to be done on any contract at any point in time.

The plaintiffs tried to show that the schedule was flawed from its inception or, in the alternative, that progress on the general construction contract was already so far behind schedule that the October 17, 1987 completion date and January, 1988 occupancy date were unrealistic. Their purpose in trying to show either of these propositions was to establish that the earliest that the Edison project would be available for student use would be September, 1988 and that, therefore, any injunction ordered by the Court would not impede the completion of the project in time for student occupancy in January, 1988.

The plaintiffs presented Richard Vanden Bosche, an expert on critical path scheduling. He testified at great length and concluded that the construction would not be completed in time for student occupancy in January, 1988, but that the most reason-

able and optimistic date for the completion of construction was not until April 1, 1988.[7] Vanden Bosche's conclusion was based on his opinion that Heery had underestimated the amount of time needed to complete four stages in the project's construction. He opined that Heery had underestimated the amount of structural steel needed for the project and therefore had underestimated the amount of time to erect the steel; that it had underestimated the amount of time needed for the construction of the foundation and for the production of bricks; and that installation of the building's clerestory windows could not be constructed as suggested by the preliminary provisional network and that proper construction of the windows would take more time than was scheduled. In addition, Vanden Bosche noted that work on the project had started later than had originally been planned and that the execution and the pouring of footings were critically behind the schedule.[8]

To counter Vanden Bosche's assertions, the defendants offered videotapes and pictures of the construction site as well as assurances that White's productivity would increase and that the project would catch up to the schedule. In addition, the defendants noted that White has a $23,400,000 performance bond and is bound by its contract to pay liquidated damages of $1000 per day for each day the project is not completed after it should have been completed.

Will the project be completed in time to permit students to use the building in January of 1988? All that is clear from the evidence presented to the Court is that construction on the project started late and was behind schedule at the time of the hearing. To conclude at this time that the project will or will not be completed on schedule would be speculation. The preliminary provisional network demonstrates that there is ample opportunity for delay in the Edison project simply because of its size and complexity. However, just because the opportunity for delay exists does not mean that a delay will occur or that if a delay occurs that it cannot be compensated for by extra work. On the other hand, the assurances by White that it will complete the job on time or the fact that it may suffer a financial penalty if it does not complete the job on time does not guarantee that the project will be completed on time. The Court does not suggest that the parties' failure to persuade it was a result of not providing either enough evidence or sufficient evidence, but rather means only to suggest that the nature of the issue makes it hard for the Court to conceive of any evidence that would have persuaded it one way or the other.

While the Court is not able to conclude whether or not the Edison project will be completed on schedule, it is able to conclude that the issuance of injunctive relief would result in a delay which would jeopardize the project's completion on schedule.[9]

---

7. Mr. Vanden Bosche's conclusions were based to a large extent on the results he obtained from inputting data into a computer programed to follow the Primavera software program. Although Mr. Vanden Bosche presented the results he obtained from running the data through the program, he did not detail what data was used or how the data was treated by the Primavera software program. Mr. Vanden Bosche described the Primavera program as being widely used in the construction industry for scheduling purposes in order to calculate "the durations, ... the floats, the dates, [and] the critical path" as well as "to check for loops [and] logic jumps." See Docket Entry No. 26 at 158, 159 and 163.

8. The plaintiffs also relied on David Sonnenthal's statements in his November 13, 1985 affidavit that "[i]f the general construction contractor does not complete the required excavation and concrete foundation before the ground freezes in 1985, it is virtually inevitable that student occupancy of Edison High School will be delayed until fall of 1988" and that "[a]s of November 12, 1985, each day of activity under the general construction contract is critical for meeting the School District's goal of occupying the Edison High School in the fall of 1987."

9. This conclusion stands regardless of whether the Court ordered that Carney be substituted for White or that the project be rebid. The delay in the former situation would be shorter than in

## II. *Discussion*

In order to support their motion for a preliminary injunction, the plaintiffs must demonstrate that irreparable harm will occur if relief is not granted to maintain the status quo until a final adjudication on the merits can be made and that there is a reasonable probability of eventual success on the merits. In addition, the Court must weigh the possibility of harm to the defendants as well as to any other interested persons and when relevant, harm to the public. *Continental Group, Inc. v. Amoco Chemicals Corporation*, 614 F.2d 351, 356–357 (3d Cir.1980). To determine whether or not to grant a motion for a preliminary injunction, a court must delicately balance all of the previously mentioned factors in an attempt to minimize the probable harm to legally protected interests between the time that the motion for a preliminary injunction is filed and the time of the final hearing. *Constructors Association of Western Pennsylvania v. Kreps*, 573 F.2d 811 (3d Cir.1978). Before engaging in this delicate balancing, however, the Court must address the two equitable defenses raised by the defendants.

### A. *Laches*

The defendants contend that Carney should have initiated its lawsuit in early August of 1985 after it received the bidding documents containing the affirmative action requirements. They argue that "[r]ather than challenging the legality of this provision [the affirmative action requirement] before submitting the bid, Carney gambled that the School District would not enforce its specifications, but then cried 'foul' when the School District held to its terms." The defendants assert that as a result of the delay in bringing this lawsuit they as well as the four prime contractors who are not parties in this action and the public will be prejudiced if the Court affords the plaintiffs injunctive relief. The prejudice which the defendants contend they would suffer is the delay in the construction of the project and the possible increase in the project's cost.

■ Laches conceptualizes the inequity which may inhere when a state claim is permitted to be enforced. It acts as a bar to an action when there has been an inexcusable delay in instituting the action and prejudice resulting to the defendant from such delay. *Gruca v. United States Steel Corp.*, 495 F.2d 1252, 1258 (3d Cir.1974); *Mansfield Area Citizens Group v. United States*, 413 F.Supp. 810, 824 (M.D.Pa.1976). In determining whether an action is barred by laches, a court must focus on the excusability of the delay and the prejudice to the defendant. *Gruca*, 495 F.2d at 1259.

■ This Court concludes that laches is not a bar to this action since the defendants have failed to show that there was an inexcusable delay or that the delay has prejudiced them. Initially, the Court notes that all of the defendants' assertions concerning delay are aimed at Carney. No claims of delay are made against either of the other two plaintiffs.

With respect to Carney, it is unreasonable to assume that it should have brought this action before the general construction contract was awarded on October 11, 1985 because until that date Carney was unaware that its bid would be the low bid, and would be rejected because it did not comply with the affirmative action requirement. Indeed, prior to the October 11, 1985 meeting at which the contracts on the Edison project were awarded, the Board of Education held a special board conference at which one of the three alternatives described by the Board's general counsel was to award the general construction contract to Carney because it met "the conditions of bidder responsibility and bid responsiveness, despite failing to comply with bid specifications as to subcontracting with minority and women-owned businesses." If the Board of Education had adopted that alternative, there would have been no lawsuit filed by the plaintiffs because the low-

the latter one, but there would be a delay in      both.

est bidder would have been awarded the contract.

Following the October 11, 1985 award of the general construction contract to White, Carney's counsel advised the Board of Education's general counsel twelve days later that he anticipated filing a lawsuit. This, however, could not have been a surprise to the general counsel who advised the Board of Education on October 11, 1985 that there might be a challenge to an award which rejected lower bids in favor of a higher bid. After retaining new counsel, Carney and the two other plaintiffs filed this action on November 12, 1985. The month and day between the award of the contract to White and the institution of this action can scarcely be characterized as a delay, let alone an inexcusable one.

The Court also notes that the prejudice which the defendants allege they will suffer is not related to the plaintiff's "delay" in bringing this action, but to the delay in the completion of the Edison project and the possibility that the project's cost would increase if the Court granted the plaintiffs' motion for a preliminary injunction. Thus, the prejudice which the defendants claim they will suffer would occur regardless of when the plaintiffs initiated their lawsuit. Delay in the project's completion and an increase in the project's cost are relevant factors in determining whether there is a possibility of harm to the public if the Court issued a preliminary injunction. *See Constructors Association of Western Pennsylvania v. Kreps*, 573 F.2d 811, 820 (3d Cir.1978); *American District Telegraph v. Department of Energy*, 555 F.Supp. 1244, 1251 (D.D.C.1983). The Court, however, does not believe such factors are relevant in determining whether or not laches should bar an action because they are unrelated to the "delay" in bringing the lawsuit.[10]

■ The length of delay in initiating an action will not mandate the applicability of laches. The Court notes that even if it had adopted the defendant's position that the plaintiffs waited three months to initiate their action, this delay is not of the same magnitude as the five month, nine month, thirteen month, and period of years that the plaintiffs delayed in initiating their actions in the cases cited by the defendants as support for the application of laches in this action. *See Circus Playhouse, Inc. v. Circus Towne Pizza*, No. 84–1641 (E.D.Pa. October 9, 1984) [Available WESTLAW, DCTU database]; *Mansfield Area Citizens Group*, 413 F.Supp. 810 (M.D.Pa.1976); *Larrecq v. Van Orden*, 21 Pa.Commonwealth Ct. 623, 346 A.2d 922 (1975); *Martin v. Adams County Area Vocational Technical School Authority*, 11 Pa.Commonwealth Ct. 292, 313 A.2d 785 (1973).

### B.  Unclean Hands

The defendants claim that this Court should not grant the injunctive relief sought by the plaintiffs because of the alleged unclean hands of Carney and Anastasi. In support of their claim, the defendants note that Anastasi has previously secured subcontracts on other public works projects by engaging in joint ventures with minority and women-owned businesses; that Anastasi is presently engaged in three such joint ventures; that Anastasi offered to engage in such a joint venture on the Edison project when it discussed subcontracting the project with White; and that Carney had previously sought to enjoin the award of a contract to a low bidder on the grounds that although its bid was higher than the bid that was awarded the contract, it was the lowest to meet the affirmative action requirement which was part of the bid specifications.

---

**10.** Laches does not result from a mere lapse of time, but from the fact that during that time, changed circumstances inequitably work to the disadvantage or prejudice of another if the claim is now enforced. As a result of the delay, the plaintiff may mislead the defendant or others into acting on the assumption that he has abandoned his claim or acquiesces in the situation. An additional result of the delay may be that changed circumstances may make it more difficult to defend against the action. *See* de Funiak, Handbook of Modern Equity, 2d ed. 1956, § 24 at 41.

A successful unclean hands defense to an injunction proceeding requires a showing by the defendants that plaintiffs' conduct is inequitable and that it involves the subject matter of the plaintiffs' claim. *Ciba-Geigy Corp. v. Bolar Pharmaceutical Co., Inc.*, 747 F.2d 844, 855 (3d Cir. 1984). In declining to hear a case because of the unclean hands of the plaintiff, a court acts out of concern for its own integrity. *See Gaudiosi v. Mellon*, 269 F.2d 873, 881–882 (3d Cir.1959). Normally, it is only when the plaintiffs' improper conduct is the source, or part of the source, of their equitable claim, that they are barred because of their conduct.[11] As the court recognized in *Republic Molding Corp. v. B.W. Photo Utilities*, 319 F.2d 347, 349 (9th Cir. 1963),

> What does seem clear is that misconduct in the abstract, unrelated to the claim to which it is asserted as a defense, does not constitute unclean hands. The concept invoking the denial of relief is not intended to serve as punishment for extraneous transgressions, but instead is based upon "considerations that make for the advancement of right and justice." *Keystone Driller Company v. General Excavator Company* (1933), 290 U.S. 240, 245, 54 S.Ct. 146, 147, 78 L.Ed. 293.
>
> What is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendant.

While the defendants have demonstrated that Carney and Anastasi have taken positions in other matters inconsistent with their positions in this action, they have shown neither that the plaintiffs have engaged in any inequitable conduct[12] nor that their prior conduct is related to the action presently before the Court. The Court, therefore, does not find that the doctrine of unclean hands is a bar to the plaintiff's action.

## C. Likelihood of success on the merits

The issue of whether Section 751 of the School Code of 1949, 24 P.S. § 7–751, proscribes a board of education from implementing an affirmative action requirement which is a material element of certain construction bid submissions is one of first impression in Pennsylvania. Section 751 of the School Code of 1949, 24 P.S. § 7–751, provides in pertinent part that:

> (a) All construction, reconstruction, repairs, maintenance or work of any nature, including the introduction of plumbing, heating and ventilating, or lighting systems, upon any school building or upon any school property, or upon any building or portion of a building leased under the provisions of section 703.1, made by any school district, where the entire cost, value, or amount of such construction, reconstruction, repairs, maintenance or work, including labor and material, shall exceed four thousand dollars ($4,000), shall be done under separate contracts to be entered into by such school district with the *lowest responsible bidder*, upon proper terms, after due public notice has been given asking for competitive bids.

(Emphasis added).

The statutory requirement that a school district must enter into construction contracts with the "lowest responsible bidder" is not unique to Pennsylvania, but is a requirement in many other states. There is no consensus by these courts which have examined the relationship between affirmative action requirements and "lowest re-

---

**11.** Professors Wright and Miller comment that the defense of unclean hands has a wider application in cases involving the misuse of patents and anticompetitive conduct when the plaintiff's conduct is inconsistent with a significant public policy, but may not injure the defendant. 11 C. Wright & A. Miller, Federal Practice and Procedure § 2946 (1973).

**12.** Inequitable conduct is conduct which "shock[s] the moral sensibilities of the judge." *Gaudiosi v. Mellon*, 269 F.2d 873, 882 (3d Cir. 1959) (quoting *Art Metal Works v. Abraham & Straus*, 70 F.2d 641, 646 (2d Cir.1934)).

sponsible bidder" statutes. A number of courts have concluded that affirmative action requirements are consistent with the legislative intent behind "lowest responsible bidder" statutes. *See Associated General Contractors of California, Inc. v. City and County of San Francisco,* 619 F.Supp. 334 (N.D.Cal.1985); *Southwest Washington Chapter, National Electrical Contractors Association v. Pierce County,* 100 Wash.2d 109, 667 P.2d 1092 (1983); *S.N. Nielson Co. v. Public Building Commission of Chicago,* 81 Ill.2d 290, 43 Ill. Dec. 40, 410 N.E.2d (1980); *Weiner v. Cuyahoga Community College District,* 19 Ohio St.2d 35, 249 N.E.2d 907 (1969), *cert. denied,* 396 U.S. 1004, 90 S.Ct. 554, 24 L.Ed.2d 495 (1970).[13] These courts have emphasized that "responsible" should be given a broad meaning to enable a school district to consider the social responsibility of the contractor. Other courts have concluded either that the body which adopts the affirmative action requirements did not have the authority to do so or that the affirmative action requirements are invalid because they conflict with the legislative intent behind the "lowest responsible bidder" statutes. *See Associated General Contractors of California v. San Francisco Unified School,* 616 F.2d 1381 (9th Cir.), *cert. denied,* 449 U.S. 1061, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980); *MGM Construction Co. v. Alameda County,* 615 F.Supp. 149 (N.D.Cal.1985); *Associated General Contractors of California v. San Francisco Unified School,* 431 F.Supp. 854 (N.D.Cal. 1977), *aff'd,* 616 F.2d 1381 (9th Cir.), *cert. denied,* 449 U.S. 1061, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980); *Georgia Branch, Associated General Contractors of America v. City of Atlanta,* 253 Ga. 397, 321 S.E.2d 325 (1984); *Arrington v. Associated General Contractors of America,* 403 So.2d 893 (Ala.1981), *cert. denied,* 455 U.S. 913, 102 S.Ct. 1265, 71 L.Ed.2d 453 (1982); *Inglewood-Los Angeles County Civic Center Authority v. Superior Court,* 7 Cal.3d 861, 103 Cal.Rptr. 689, 500 P.2d 601 (1972).

These courts have emphasized that "responsible" should be construed to permit only a consideration of factors related to the issue of whether the contractor has the requisite skill and ability to complete the project.

With respect to the affirmative action requirements which were part of the Edison project contract specifications, the Court must first determine whether the Superintendent of the School District had the authority to promulgate the July 1, 1984 Economic Affirmative Action Standard Operating Procedures. As authority for the Standard Operating Procedures, Superintendent Clayton cited the Public School Code of 1949 and the Board of Education's December 19, 1983 Resolution. While the resolution directs the Superintendent to "establish practices and procedures necessary for implementation of the interim [affirmative action] plan," the defendants now concede that the authority to establish the interim affirmative action plan which the Superintendent promulgated as the July 1, 1984 Economic Affirmative Action Standard Operating Procedures comes from Article XII of the Philadelphia Home Rule Charter, 351 Pa.Code §§ 12.12–100—12.12–503, and not from the Public School Code of 1949. The broad power given to the Board of Education in the Philadelphia Home Rule Charter, however, is tempered by Sections 12.12–300 and 12.12–500 which provide that the Board of Education does not have powers or duties "inconsistent with law" and that the School District, as a part of the Commonwealth's system of education, is "subject to all laws relating to school matters which are of statewide application." *See also* 53 P.S. §§ 13219(a)(3) and 13219(c).

The ultimate issue, therefore, for this Court to resolve is that of whether the affirmative action requirements are inconsistent with Section 751 of the School Code of 1949, 24 P.S. § 7–751. If the Court concludes that there is an inconsistency,

---

**13.** *Accord* 10 E. McQuillin, The Law of Municipal Corporations § 29.73 at 29 (3d ed. Supp. 1985).

then it would follow that the Board of Education did not have the power to enact the affirmative action requirements.

Pennsylvania courts have had occasion to review the meaning of statutes which mandate that either a school district or a municipality award contracts to the "lowest responsible bidder" and have held the following: (1) executive officers of municipalities and school districts have discretion to determine who are and who are not responsible bidders; (2) the term "lowest responsible bidder" does not mean the lowest bidder in dollars; (3) in determining who are responsible bidders, the executive officers of municipalities and school districts should form an intelligent judgment by investigating the bidders to learn their financial standing, reputation, experience, resources, facilities, judgment, efficiency as builders, promptness, faithfulness, capacity and ability to do the work according to the plans and specifications, and the safety of prior work done by them; (4) once it has been determined who are the responsible bidders, the contract must be awarded to the lowest of them; (5) a court should only interfere with the exercise of this discretion when it is shown to have been abused as a result of a misconception of law, ignorance through lack of inquiry into facts necessary to form intelligent judgment or of arbitrary will or caprice; and (6) the purpose and public policy behind provisions requiring that contracts be awarded to the "lowest responsible bidder" is to protect the taxpayer public from any possible collusion and dishonesty, and to insure that materials or supplies are purchased at the best possible price. *See Lutz Appellate Printers, Inc. v. Commonwealth,* 485 Pa. 559, 403 A.2d 530 (1979), and 472 Pa. 28, 370 A.2d 1210 (1977); *R & B Builders, Inc. v. School District of Philadelphia,* 415 Pa. 50, 202 A.2d 82 (1964); *R.S. Noonan, Inc. v. School District of York,* 400 Pa. 391, 162 A.2d 623 (1960); *Yoder v. School District of Luzerne Township,* 399 Pa. 425, 160

A.2d 419 (1960); *Pearlman v. City of Pittsburgh,* 304 Pa. 24, 155 A. 118 (1931); *Kratz v. City of Allentown,* 304 Pa. 51, 155 A. 116 (1931); *Schuck v. School District of Baldwin Township,* 296 Pa. 408, 146 A. 24 (1929); *Wilson v. City of New Castle,* 301 Pa. 358, 152 A. 102 (1930); *Hibbs v. Arensberg,* 276 Pa. 24, 119 A. 727 (1923); *Conduit and Foundation Corp. v. City of Philadelphia,* 41 Pa.Commonwealth Ct. 641, 401 A.2d 376 (1979); *Commonwealth v. Zang,* 142 Pa.Superior Ct. 566, 16 A.2d 741 (1940).

The plaintiff's assertion that the Supreme Court of Pennsylvania would conclude that the affirmative action requirements are inconsistent with Section 751 is based on their characterization of the previously cited Pennsylvania decisions as standing for the proposition that a board of education's inquiry into whether a bidder is responsible is confined to a consideration of *only* "the bidder's ability to perform the work efficiently, properly and expeditiously." [14] They further assert that consideration of whether a bidder meets the affirmative action requirements is neither related to ascertaining whether the bidder has the requisite ability to perform the work nor calculated to comply with Section 751's purpose of protecting the taxpaying public.

The Court does not believe that the previously cited Pennsylvania cases limit a board of education's discretion by mandating that consideration of compliance with affirmative action requirements is inconsistent with Section 751's requirement that school contracts be awarded to the lowest responsible bidder. In those cases, the taxpayers argued that the award of the contract was made without an adequate investigation of the bidder's responsibility or that the finding that the lowest bidder was not responsible was erroneous. They did not involve a challenge to the propriety of a board of education or municipality considering factors not related to the bidders'

14. There is no dispute that both Carney and White have the ability to perform the work required on the Edison project in an efficient, proper and expeditious manner. Heery

Management, Inc., the Edison project construction manager, found both Carney and White to be qualified and able to perform in an acceptable manner.

ability to perform the work efficiently, properly and expeditiously.

The scope of the term "responsible" has remained unchanged and unchallenged since Justice Kephart's 1923 and 1930 pronouncements in *Hibbs* and *Wilson*. In fact, in neither *Hibbs* nor *Wilson* was the scope of the term "responsible" an issue. In light of the Pennsylvania Legislature's commitment to preventing discrimination as evidenced by the Pennsylvania Human Relations Act, 43 P.S. §§ 951–962.2, and Section 755 of School Code of 1949, 24 P.S. § 7–755,[15] which requires antidiscrimination provisions in all school district contracts, this Court believes that the Supreme Court of Pennsylvania would conclude that the affirmative action requirements are consistent with Section 751 and support the policy behind Section 751 of protecting the taxpaying public by insuring the social responsibility of those who receive school contracts. As the court observed in *Weiner v. Cuyahoga Community College District*, 19 Ohio St.2d 35, 38–39, 249 N.E.2d 907, 910 (1969) *cert. denied*, 396 U.S. 1004, 90 S.Ct. 554, 24 L.Ed.2d 495 (1970):

> It may be argued that requiring public contractors to take affirmative action to forestall discriminatory employment practices in the performance of their contracts will tend to raise the cost of such contracts. Increased costs impair another governmental interest, that of economy. It must be noted, however, that neither state nor federal contracts are secured only to the lowest bidder, but to the lowest *and best* bidder and lowest

*responsible* bidder. Moreover, the alternative of securing a like degree of compliance with equal employment opportunity laws by means of public prosecutions and administrative proceedings is also costly and, in addition, is both *post hoc* and punitive. Indeed, it might reasonably be supposed that the governmental objectives of equal employment opportunity and low-cost public construction would be better served by requiring public contractors to undertake affirmative duties in practicing nondiscrimination in their dealings with and through others in the performance of the contract, thereby denying the benefits of public contract expenditures to those who would discriminate.

In addition to economics as a reason for requiring public contractors to assure nondiscriminatory performance, the strong moral commitment of both state and federal government to fair employment practices is reflected in their respective legislation. A government which has declared discriminatory employment practices unlawful should not then finance them indirectly by binding only its direct contractor, and not the entire contract performance, to a promise of attempted compliance. We conclude that the capacity to assure a performance which complies with antidiscrimination laws is reasonably a part of the standard of a best or responsible bidder on a contract involving the expenditure of public funds. Accordingly, a bidder for a construction contract to be awarded

---

**15.** Section 755 provides that:

Every contract for or in behalf of any school district for the construction, alteration, or repair of any public building or public work, shall contain provisions by which the contractor agrees—(1) That in the hiring of employees for the performance of work under this contract, or any sub-contract hereunder, no contractor, sub-contractor, nor any person acting on behalf of such contractor or sub-contractor, shall, by reason of race, creed or color, discriminate against any citizen of the Commonwealth of Pennsylvania who is qualified and available to perform the work to which the employment relates; (2) That no contractor, sub-contractor, nor any person on

his behalf, shall in any manner discriminate against or intimidate any employee hired for the performance of work under his contract on account of race, creed or color; (3) That there may be deducted from the amount payable to the contractor under this contract, a penalty of five dollars ($5) for each person for each calendar day during which such person was discriminated against or intimidated, in violation of the provisions of the contract; and, (4) That this contract may be cancelled or terminated by the school district, and all money due or to become due hereunder may be forfeited, for a second or any subsequent violation of the terms or conditions of this portion of the contract.

by a public body of this state may be required to assure, by appropriate promises contained in contract provisions or related instruments, no discrimination in employment in the entire performance of the contract.

(Emphasis in original).

The Court, therefore, concludes that the plaintiffs have not demonstrated a likelihood of success on the merits.[16]

### D. Irreparable Harm

█ The only harm which might befall the plaintiffs as a result of the Court not affording them the injunctive relief they request would be the possible failure to reduce the cost of the Edison project by substituting Carney for White as the general contractor. Even if the plaintiffs are accurate in their assertion that the taxpayer will reap a savings by substituting Carney for White, the Court does not believe that the savings which the public would realize would offset the harm which it would suffer as a result of the award of a contract to a general construction contractor who had not proven itself to be socially responsible.

### E. The Public Interest

█ As previously described, the need for the Edison project to be completed on

schedule is important to the student body which would attend the new high school. The failure of the project's timely completion will result in many students not being able to obtain the vocational training they seek from the school district. The schedule for the Edison project is ambitious, tight, and exacting. While the Court cannot guarantee that the project will be completed on time if it doesn't provide the injunctive relief sought by the plaintiff, it is able to conclude that the issuance of injunctive relief would jeopardize the project's timely completion. The Court believes that the public interest is best served by not risking the educational gains that would result from the project's timely completion on the possibility that the substitution of Carney for White would result in financial gains to the public.

### III. Conclusion

█ Having concluded that plaintiffs have failed to show that they have a reasonable probability of success on the merits or that irreparable harm will occur if relief is not afforded them and that the public may be harmed if the Court grants the plaintiffs' motion for a preliminary injunction, the Court will deny the motion.

An appropriate Order follows.[17]

---

16. The plaintiffs claim that because the facts material to the claim under Section 751 are not in dispute and have been fully addressed on the record, the Court should issue a final adjudication and therefore need not consider irreparable harm or injury to the public. Fed.R.Civ.P. 65(a)(2) permits the trial judge to consolidate a hearing on an application for preliminary injunction with the trial of the action on the merits, on his own motion, either prior to or during the original hearing. The consolidation, however, must be accompanied by notice to the parties, either before or after the commencement of the hearing, sufficient to enable them to present all their evidence. See Fenstermacher v. Philadelphia National Bank, 493 F.2d 333–337 (3d Cir.1974). While the Court agrees that both parties have had ample opportunity to present evidence and have fully addressed the issue, it will not issue a final adjudication on the merits because the defendants have not joined the plaintiffs in seeking the final adjudication and could conceivably desire to present additional evidence to the Court.

17. At the preliminary injunction hearing, the Court took under advisement the admissibility into evidence of plaintiffs' exhibits 17 through 25 and defendants' exhibits 4, 6, 37 and 38 and instructed counsel to submit written explanations of their respective positions to the admissibility of these exhibits. The Court has reviewed the submissions and concludes that all the exhibits taken under advisement should be admitted into evidence.

The defendants also argued that a preliminary injunction is unwarranted because Carney's bid was materially non-responsive to the affirmative action requirements in the bidding specifications. The Court notes that this argument is not responsive to the plaintiffs' primary contention that the affirmative action requirements are illegal. If the Court had found the plaintiffs' position persuasive, it does not understand how it would matter that Carney's bid did not comply with an illegal bid requirement.

## ORDER

AND NOW, this 30th day of April, 1986, upon consideration of plaintiffs' application for a preliminary injunction (Docket Entry No. 8), defendants' answer (Docket Entry No. 14), the transcript of the preliminary injunction hearing and oral argument (Docket Entry Nos. 25–28 and 35), plaintiffs' proposed findings of fact and conclusions of law (Docket Entry No. 29), defendants' proposed findings of fact and conclusions of law (Docket Entry No. 30), plaintiffs' rebuttal findings of fact and conclusions of law (Docket Entry No. 31), defendants' supplemental proposed findings of fact and conclusions of law (Docket Entry No. 32), defendants' post-argument memorandum of law (Docket Entry No. 34), plaintiff's response to defendants' memorandum of law (Docket Entry No. 36), and in accordance with the foregoing Memorandum, it is hereby ORDERED that:

1. Plaintiffs' exhibits 17 through 24 and defendants' exhibits 4, 6, 37 and 38 are ADMITTED into evidence; and

2. Plaintiffs' application for a preliminary injunction is DENIED.